Argued and submitted May 13, 2009, decision of Court of Appeals affirmed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings August 12, 2010

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## ERIN ALBERT AYLES,
*Respondent on Review.*

(CC 051228; CA A132029; SC S056577)

237 P3d 805

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief were John R. Kroger, Attorney General, and Rolf C. Moan, Acting Solicitor General.

David Ferry, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

GILLETTE, J.

Durham, J., concurred and filed an opinion.

Kistler, J., dissented and filed an opinion, in which Balmer and Linder, JJ., joined.

**GILLETTE, J.**

In this criminal case, a police officer unlawfully detained defendant, a passenger in a car that the officer lawfully had stopped for a traffic violation, and then sought and obtained defendant's consent to search his person. The case requires us to consider whether defendant established a minimal factual link between the illegal detention and his consent to a search of his person during that illegal detention. If he did establish the required link, then the burden shifted to the state to demonstrate that contraband seized during that search was not obtained as a result of an exploitation of the illegal detention. The case presents a further question: Must evidence found and incriminating statements made after defendant was arrested and advised of his rights under *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), be suppressed because they also were the product of the preceding illegal detention? We hold that defendant has shown the required minimal factual connection between the illegal detention and his consent. We also hold that the later administration of *Miranda* warnings did not sufficiently attenuate the taint of the illegal detention to permit this court to conclude that the defendant's subsequent incriminating statements, and the evidence found as a result of those statements, were not the product of the prior illegality. We therefore affirm the decision of the Court of Appeals, *State v. Ayles*, 220 Or App 606, 188 P3d 378 (2008), to that effect.

The following facts are undisputed. On June 7, 2005, at 9:47 a.m., state police trooper Hunt observed a car driving 67 miles per hour in 55 miles-per-hour zone on Highway 26. He also noticed that the car did not have a front license plate. Hunt stopped the car for the two violations. The stop occurred some 15 miles east of Seaside, Oregon, and about two miles from the nearest gas station-convenience store. The area was wooded and there were no residences nearby. Hunt approached the driver and noticed that she appeared to be under the influence of methamphetamine. Defendant was sitting in the front passenger seat. Three other people were sitting in the back seat of the car.

Hunt explained to the driver why he had stopped the car. When Hunt then asked the driver if there was any methamphetamine in the car, defendant interrupted, asking the trooper how to rectify the license plate situation so that they could avoid being stopped again. Hunt answered defendant's question. Although defendant had not done anything to cause Hunt to believe that defendant had committed a crime, Hunt found it suspicious that defendant had spoken up while Hunt was questioning the driver about methamphetamine. Hunt's suspicions also were aroused by defendant's demeanor, which Hunt described as "over friendly."

Hunt asked defendant for his identification. Defendant handed Hunt a Department of Veterans' Affairs identification card. Hunt took it and put it in his patrol car. He then had the driver get out of the car and told her that he suspected that she was under the influence of methamphetamine. He patted her down, did not find weapons or contraband, and told her to sit on the rear bumper of her car. He returned to the patrol car and ran a computer check on defendant and the driver. That check did not reveal anything of interest. Nonetheless, Hunt continued to retain defendant's identification.

Hunt returned to the car and asked defendant to step out. Defendant did so. Hunt asked defendant if he had any weapons, and defendant replied that he did not. Hunt then asked defendant for consent to pat him down, which defendant gave. Hunt had defendant interlace his fingers and put them to the back of his neck, and then Hunt put one hand on defendant's hands in preparation for the patdown. From his vantage point at that moment, Hunt could see down into defendant's right breast pocket, where he observed an unlabeled prescription pill bottle that contained something wrapped in plastic. From Hunt's training and experience, he believed that the pill bottle contained illegal drugs. He took the bottle out of defendant's pocket and asked defendant, "Is that the meth?" Defendant admitted that it was. Hunt arrested defendant, handcuffed him, advised defendant of his *Miranda* rights, searched him more thoroughly, and placed him in the back seat of the patrol car.

Hunt then conducted field sobriety tests on the driver and arrested her for driving under the influence of intoxicants. He asked the three remaining passengers to step out of the car. As they were getting out, one of the passengers told Hunt that there was a blue backpack in the car that belonged to defendant. Hunt then went back to the patrol car and asked defendant to step out again. He asked defendant if the backpack was his, and defendant admitted that it was. Hunt then asked defendant if there was any additional methamphetamine in the backpack; defendant replied that there was and described in detail what Hunt would find in the backpack. Hunt searched the backpack and found the methamphetamine as defendant described, as well as other drug paraphernalia.

Defendant was charged with possession and manufacture/delivery of methamphetamine. Before trial, he moved to suppress all of his statements and the evidence obtained after Hunt took his identification. He argued that he was seized in violation of Article I, section 9, of the Oregon Constitution, when Hunt took and retained his identification, because Hunt had no reasonable suspicion at that time that defendant either had committed a crime or posed a threat to Hunt's safety. The trial court denied the motion. The court ruled that defendant was not illegally seized when Hunt took defendant's identification. In light of that ruling, the trial court concluded that defendant's consent to search his person was voluntary, his subsequent arrest was lawful, and the statements that he made after receiving *Miranda* warnings also were voluntary.[1] The trial court then conducted a stipulated facts trial and convicted defendant of the possession offense.

Defendant appealed his conviction to the Court of Appeals, assigning error to the trial court's denial of his

---

[1] The trial court noted, however, that, if the taking and retaining of defendant's identification were considered an illegal detention, then suppression would have been required because, the trial court found,

"[d]efendant's identification was held during the stop where a reasonable person would not feel free to leave. The consent for search was in close proximity to obtaining defendant's identification and asking him to exit. The state did not produce any evidence regarding inevitable discovery, independent discovery or a tenuous factual link that would still allow the search."

motion to suppress. In the Court of Appeals, the state conceded that the taking and retaining of defendant's identification amounted to an unlawful seizure under Article I, section 9, of the Oregon Constitution. The Court of Appeals accepted that concession as well founded and held that the trial court erred in ruling to the contrary. *Ayles*, 220 Or App at 611.

The court then turned to the state's arguments that defendant's consent to search was not the result of an exploitation of the unlawful seizure, and that the giving of *Miranda* warnings attenuated the taint of the preceding unlawful police conduct. *Id.* The court quoted a statement from this court's opinion in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), explaining that a defendant who seeks suppression of evidence obtained from a consensual search on the ground that the search was the product of illegal police conduct bears an initial burden to show a " 'minimal factual nexus between the unlawful police conduct and the defendant's consent.' " *Ayles*, 220 Or App at 611-12 (quoting *Hall*, 339 Or at 34-35). Under *Hall*, if the defendant has met that burden, then the burden shifts to the state to prove "that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." 339 Or at 35. The state argued that defendant had failed to make the initial showing required of him in this case. The Court of Appeals rejected that argument, holding that there was a minimal factual nexus between the illegal taking and retaining of defendant's identification and the ultimate discovery of contraband. The court then went on to hold that the state had failed to "demonstrate[ ] the existence of any intervening circumstances or other factors that might mitigate the effect of the illegal detention of defendant." *Ayles*, 220 Or App at 613. Finally, the Court of Appeals concluded that the evidence found in defendant's backpack after he had been handcuffed, arrested, and advised of his rights under *Miranda* also should have been suppressed because, in this case, the *Miranda* warnings were not a sufficient intervening circumstance to purge the taint of the previous illegal police conduct. *Id.* at 616. Accordingly, the Court of Appeals reversed the judgment of the trial court.

The state seeks review of that decision. The state contends that the Court of Appeals erroneously concluded

that there was a minimal factual nexus between defendant's consent to search and the prior illegal police conduct simply because the illegal police conduct preceded the giving of consent and the making of statements. The state asserts that defendant was detained not just as a legal matter, by the taking and retaining of his identification, but also as a factual matter, by the lawful stop, in a remote location, of the car in which he was riding. According to the state, the factual considerations trump the legal ones: Because, as a practical matter, defendant could not have left the scene, Hunt's request for consent to search defendant was causally unrelated to the unlawful police conduct.

Before we begin our analysis of the legal issues presented in this case, we pause to observe how limited the state, as petitioner here, has chosen to make them. First, the state has not asked this court to reconsider *Hall*. Second, the state does not argue that the Court of Appeals was wrong to conclude that the state had not met *its* burden to show that the consent would have occurred independent of the illegality or that the connection between the unlawful stop and the consent was attenuated. Rather, as the state has presented the case to this court, the only issues are whether (1) defendant met his initial burden to show a minimal factual nexus between the unlawful police conduct and his consent to search, and whether (2) the giving of *Miranda* warnings was a sufficient intervening circumstance, standing alone, to mitigate the taint of the preceding unlawful police conduct on defendant's later statements about the evidence in the backpack. We turn to those issues.

 As the state has acknowledged, defendant was seized in violation of Article I, section 9, of the Oregon Constitution, when Hunt took and retained defendant's identification without reasonable suspicion of criminal activity. Defendant consented to the search of his person *during* that illegal seizure.[2] That consent was voluntary, *i.e.*, there is no evidence in the record that defendant's free will was overcome by the illegal police conduct. *See Hall*, 339 Or at 20-21

---

[2] This, therefore, is not a case in which the unlawful police conduct merely "preceded" defendant's giving of consent. The record is clear that the unlawful detention here was ongoing—Hunt continued to retain defendant's identification—when defendant gave his consent to the search.

(suggesting distinction between two ways in which violation of defendant's rights under Article I, section 9, may affect validity of defendant's consent to search—situations in which police conduct renders defendant's consent involuntary, and situations where consent is voluntary, that is, the illegal police conduct does not rise to level of overcoming defendant's free will, but nevertheless affects defendant's decision to consent). That is, even when consent is voluntary as a matter of "free will," evidence obtained as a result of the ensuing search is not admissible unless the state also can "prove that the consent was independent of, or only tenuously related to, any preceding violation of the defendant's rights under Article I, section 9." *Hall*, 339 Or at 27.

As noted above, in *Hall*, the court described a paradigm for analyzing the effect of an illegal detention on the admissibility of evidence obtained from a subsequent "consensual" search:

> "After a defendant shows a minimal factual nexus between unlawful police conduct and the defendant's consent, then the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent. * * * Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Id.* at 34-35. And, as noted above, this case requires us only to examine what is required for the defendant to establish the "minimal factual nexus" that is mentioned in the first sentence of the foregoing paragraph.[3]

---

[3] It is important to emphasize again that we need not determine whether the *state* has met *its* burden to show that there is no causal connection between the

■ The state argues that, in this case, defendant has not proved that there was *any* factual nexus, even a minimal one, "between the illegal stop—the taking and retaining of defendant's identification—and the trooper's request for consent to pat down defendant," because (1) defendant was a passenger in a car that was lawfully stopped in a remote location when the officer asked defendant for that consent, and (2) according to the state, there was evidence in the record that Hunt would have asked defendant for consent to search him even if Hunt had not asked defendant for identification. And, the state argues, "if the only preceding illegality—the taking and retaining of defendant's identification—was not causally related to the trooper's request for defendant's consent to a patdown, then there was no taint to purge." As the state stresses, " '[b]ut for' causation may require only a 'minimal factual nexus,' *Hall*, 339 Or at 25, but it is not devoid of all meaning and it is not the equivalent of *post hoc ergo propter hoc*[.]"

There are two problems with the state's argument. First, it misunderstands the *Hall* analysis. Second, it misunderstands the undisputed facts of the encounter. With respect to the first point, *Hall* requires the defendant to

---

preceding illegality and defendant's consent that would require suppression of the evidence found as a result of the ensuing search. That is so because the state did not argue below, and does not argue in this court, that, if defendant had not established the requisite minimal factual nexus, the state did or could meet its burden to prove that defendant's consent (and the consequent discovery of the prescription pill bottle containing methamphetamine) was independent of, or only tenuously related to, the unlawful police conduct. As noted, the trial court observed that "[t]he state did not produce any evidence regarding inevitable discovery, independent discovery or a tenuous factual link that would still allow the search." 348 Or at 626 n 1. The state has never challenged that observation.

The dissent does not acknowledge this posture of the case. The dissent states:

"As a matter of causation, two independent causes prevented defendant from leaving. One was lawful; the other was not. Under those circumstances, any causal connection between the retention of defendant's identification card and his voluntary consent to the patdown search was so faint that defendant's voluntary consent was sufficient to break the causal chain."

348 Or at 646 (Kistler, J., dissenting). The dissent then goes on to explain why, in its view, the state had met its burden to prove attenuation with respect to the consent to the patdown search. The problem with the foregoing, of course, is that it purports to explain why the state should prevail here, when the state did not argue the dissent's theory *either to this court or to the Court of Appeals*. The state is the petitioner here. It must live with what it has raised and argued—a small enough requirement, but one from which the dissent is not entitled to relieve it.

establish a "minimal factual nexus between unlawful police conduct *and the defendant's consent*," not the police officer's request for consent. That is, the focus of the factual nexus determination is not on whether *Hunt's decision* to ask defendant for consent was caused by his taking of defendant's identification; rather, it is on whether defendant would have consented to the search that uncovered the evidence if the officer had not unlawfully seized him. The second problem with the state's theory lies in its assertion that the only factual nexus that defendant has shown is that the unlawful police conduct *preceded* his consent. As noted, however, the illegal seizure did not simply *precede* the consent— it was *ongoing* at the time defendant gave his consent to the search; therefore, the two events were not just in close "temporal proximity," *Hall*, 339 Or at 35, but were occurring simultaneously.

■ When we apply the law, properly understood, to the facts of the case, we conclude that defendant met his burden to establish a minimal factual nexus between the illegal police conduct and his consent to search. During defendant's unlawful seizure, defendant was not free to leave. The unlawful police conduct thus made defendant available to Hunt for questioning. Although the state asserts that, as a practical matter, defendant would have remained at the scene regardless of the illegal seizure (because his driver had been lawfully stopped and the location of the stop was somewhat remote), the state has pointed to no evidence in the record that defendant would not have left had he not been illegally detained. Indeed, the state's only argument on that point is that the nearest convenience store was about two miles away and the stop of the driver occurred 15 miles east of Seaside. Those facts alone do not establish that it would have been impossible, or even extremely difficult, for defendant to leave the scene. But our point is an even more fundamental one: Whether or not defendant would have asserted his personal liberty and left the scene once his identification was returned to him, we cannot conclude that the illegal seizure of defendant, *while it was ongoing*, had no factual nexus to defendant's decision to consent. A defendant gains nothing from having a constitutional right not to be seized if the police can seize him and—by definition—use the circumstance of that

seizure as a guarantee of an opportunity to ask him to further surrender his liberty. There was a minimal factual nexus between defendant's illegal seizure and his decision to consent.

This court's recent decision in *State v. Thompkin*, 341 Or 368, 143 P3d 530 (2006), provides strong support for that conclusion. In *Thompkin*, a police officer requested and retained the defendant's identification during a lawful stop of the car in which defendant was a passenger. At that time, the officer did not have either a reasonable suspicion of criminal activity on the defendant's part or a concern for the officer's own safety. While the defendant was seized, an officer asked the defendant if she had any drugs or weapons on her person. In response, the defendant handed the officer a crack pipe. The officer then asked the defendant if she would consent to a search of her person. Defendant responded by getting out of the car and complying with the request to search. The ensuing search revealed a rock of crack cocaine.

This court held that the defendant had been unlawfully seized for purposes of Article I, section 9, of the Oregon Constitution, when the officer took and retained her identification without either reasonable suspicion of criminal activity or of a threat to his safety. *Id.* at 379. It then turned to the question whether suppression of the evidence obtained during that illegal seizure was required. The court began by setting out the *Hall* analysis to be used in situations such as these, then emphasized that,

> "[o]nce a defendant demonstrates a minimal factual nexus between prior, unlawful police conduct and the evidence sought to be suppressed, deciding whether the state has carried its burden requires a fact-specific inquiry into the totality of the circumstances."

*Thompkin*, 341 Or at 380. The court acknowledged that, in *Hall* and the cases that *Hall* relied on, the defendants consented to be searched during an unlawful seizure, whereas in *Thompkin*, the defendant directly surrendered incriminating evidence in response to police questioning during an unlawful seizure—but the court held that those slight factual differences were of no constitutional moment. Thus, the court held, because of the close temporal proximity between the

illegal seizure of the defendant and her surrender of the crack pipe, as well as the absence of any intervening circumstances attenuating the effects of the unlawful police conduct, "the state failed to prove that [the] defendant's decision to surrender incriminating evidence, even if voluntary, was not the product of the preceding violation of her rights under Article I, section 9." *Id.* at 381. It followed, the court held, that the evidence obtained during the unlawful seizure had to be suppressed. *Id.*

The state points out that the court in *Thompkin* did not expressly find that the defendant there had established a "minimal factual nexus" between the unlawful police conduct and her surrender of incriminating evidence in response to police questioning; rather, the court appeared to have assumed such a connection without considering the matter. And, the state suggests, had the court properly considered the question, it would have concluded that, as here, there was no causal connection between the unlawful seizure and the defendant's subsequent incriminating action.

We disagree. It is true that, in certain of this court's cases, including *Thompkin* and even *Hall* itself, the court has not expressly found the existence of a minimal factual connection between illegal police conduct and a defendant's decision to consent. Rather, the court in those cases appears to have assumed without discussion that the defendant had met that initial burden by establishing that the defendant had consented to a search *during* an illegal seizure. The court merely stated the requirement of a minimal factual nexus and then proceeded immediately to an examination of whether the state had met its burden to prove that the connection was too tenuous to require suppression.

On the other hand, the state has cited no case, and our research discloses none, in which a court has found the *absence* of a minimal factual nexus between an unlawful seizure that is ongoing and a defendant's decision to consent to an officer's request to search. We think that the reason both that the court sometimes assumes without discussion that a defendant has shown the required nexus when consent occurs during an ongoing seizure and that no case exists

holding that there is no minimum connection in such circumstances is that the existence of a minimal factual nexus is obvious in cases in which the defendant consents to a search (or takes other incriminating action) *during an illegal seizure*. That conclusion is reflected in this court's recent decision in *State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010). In that case, without any discussion or explanation, this court expressly concluded that the defendants in that case "ha[d] shown the required nexus" by showing that they consented to be searched during a period of unlawful detention. *Id.* at 629-30.

■ To summarize, then, we agree with the state that the "minimal factual nexus" standard is a true standard, not a resort to the logical fallacy, *"post hoc ergo propter hoc."* However, a defendant establishes a more substantial connection than merely one thing occurring after another when that defendant establishes that he or she consented to a search *during* an unlawful detention. In such a circumstance, the fact that the defendant is not legally free to leave because of the illegal police activity cannot be discounted in motivating the defendant's consent and, therefore, such illegal police conduct normally will be at least minimally connected to the defendant's decision to consent.[4] We hold that this is such a "normal" case—*i.e.*, defendant in this case met his initial burden, thereby shifting the burden to the state to prove that the evidence obtained did not derive from exploitation of the unlawful police conduct. As noted, the posture of this case makes that remaining inquiry a narrow one. The state has not argued that it did or could meet its burden to prove that defendant's consent to search was independent of, or only tenuously related to, Hunt's unlawful seizure of defendant in violation of Article I, section 9, of the Oregon Constitution. Therefore, as the Court of Appeals correctly concluded, the trial court should have suppressed the evidence found in the ensuing search—*viz.*, the prescription pill bottle containing methamphetamine.

---

[4] We say "normally," because this is not a *per se* rule. Among many other scenarios, it is always possible that the state will be able to produce, for example, an admission by defendant to some other person to the effect that he would have remained at the scene or consented in any event.

We turn to the second part of the state's argument—that, after defendant was given *Miranda* warnings, the incriminating statements that he made, and the evidence eventually found in his backpack, were admissible notwithstanding the prior illegality. The state asserts:

> "In the state's view, the giving of *Miranda* warnings always suffices to break the chain between a prior illegality and post-*Miranda* admissions or statements. Even if that is not true, at a minimum the giving of the warnings is an extremely strong indicator that post-*Miranda* statements were not obtained through exploitation of the prior illegality."

The state also argues that, in holding that the *Miranda* warnings did not attenuate the taint of the preceding illegality, the Court of Appeals improperly minimized the effect of those warnings in this case. In fact, according to the state, the Court of Appeals went so far as to suggest that the giving of *Miranda* warnings itself has a coercive effect that negates the voluntariness of the subsequent statements, when the court stated that the warnings

> " 'could perpetuate the person's perception that his or her liberty continued to be restrained as the officer pursued a criminal investigation by seeking consent to a search.' "

*Ayles*, 220 Or App at 614 (quoting *State v. La France*, 219 Or App 548, 557, 184 P3d 1169 (2008)). On the contrary, the state notes, this court stated in *Thompkin* that *Miranda* warnings could, in fact, be an intervening circumstance adequate to break the causal chain between the defendant's statements and the prior illegality. *See Thompkin*, 341 Or at 380 (so stating). The state then concludes that where (as it characterizes the situation), "the prior illegality amounted only to taking and retaining defendant's identification[,] * * * the [later] giving of *Miranda* warnings, followed by defendant's admission that more methamphetamine was in his backpack, served to dissipate the taint of the illegal proceeding."

We agree with the state that the Court of Appeals' statement creates an incorrect impression: The giving of the warnings, which is intended to assure voluntariness, cannot be used in the way that the Court of Appeals used it to prove

a contrary theory. To be sure, it is clear from context that the Court of Appeals was not talking specifically about coercion or the voluntariness of post-*Miranda* statements at all. Rather, the court merely made the observation that, in the "totality of the circumstances" surrounding a defendant's consent to search during an ongoing unlawful seizure, the *Miranda* warnings themselves could have an effect on a defendant's feeling that his liberty was being restrained and, therefore, on his consequent decision to consent. We think, however, that the court's statement is too prone to misinterpretation, and therefore should not be used in this way again.

■■ We return to the central issue. As with defendant's consent to search, defendant concedes that the statements that he made in response to Hunt's questions after Hunt administered the *Miranda* warnings were voluntary—that is, they were not actually coerced by police conduct that overcame his free will. Nonetheless, like the evidence found after defendant's consent to search, those statements, and the methamphetamine and related paraphernalia found as a result of those statements, are inadmissible unless the state can demonstrate that the statements and evidence did not derive from the preceding illegal seizure of defendant's person.[5] Again, *Hall* provides the paradigm for our analysis of whether the state has met that burden. For convenience, we repeat that paradigm here:

> "Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent. * * * Although determining the existence of

---

[5] As we held in the first part of this opinion, defendant met his initial burden to establish a minimal factual nexus between the illegal police conduct and his decision to consent to the first patdown of his person. The burden then shifted to the state to prove that all of defendant's subsequent statements, including his later consent to the search of his backpack, and the evidence discovered as a result of those statements, including the drugs and paraphernalia found in the backpack, did not derive from exploitation of the illegal seizure of his person. As noted, the state did not argue that it had met its burden with respect to the evidence found in the search of defendant's person. However, the state does argue that defendant's consent to the search of his backpack was so attenuated from the initial illegal police conduct that the evidence found therein should not be suppressed.

such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

339 Or at 35. As noted, the state argues that the giving of *Miranda* warnings was an "intervening circumstance" sufficient to attenuate any taint from Hunt's unlawful conduct in taking and retaining defendant's identification.

*Hall* requires us to conduct a "fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct" and the statements and evidence that defendant asks be suppressed. In this case, that totality of the circumstances includes the fact that Hunt gave defendant the *Miranda* warnings after Hunt arrested defendant for possessing the prescription pill bottle containing methamphetamine. That arrest was unlawful because it was based on evidence found in an unlawful search of defendant's person. Moreover, after defendant's arrest, and at the time that Hunt asked defendant about the backpack, defendant was handcuffed and in custody in the back of a patrol car. Hunt's questions pertained to defendant's possession of additional quantities of the same drug that he had already been arrested for possessing, and, at the time of the questioning, Hunt was holding the backpack that contained those drugs. Those facts all suggest that the initial unlawful police conduct—the unconstitutional seizure of defendant's person—affected defendant's actions from his initial consent to be searched through the time that he responded to Hunt's questions about the backpack. That is, the "temporal proximity" factor plainly weighs in defendant's favor.

The question then is whether, notwithstanding those ongoing effects of the prior illegality, the state has met its burden to show that the *Miranda* warnings alone (the state has pointed to nothing else) were sufficient to ensure that the unlawful police conduct did not affect, or had only a

tenuous connection to, defendant's responses to Hunt's questions or the later discovery of the methamphetamine in the backpack. This court considered a very similar question in *State v. Olson*, 287 Or 157, 598 P2d 670 (1979). In that case, the police had probable cause to arrest defendant for burglary. They went to his house late in the evening and knocked and announced their presence. After receiving no response, the officers opened the defendant's door, entered his house, and found the defendant in bed with his girlfriend. They then searched the house without a warrant and, finding some items taken in the burglary, arrested the defendant and advised him of his *Miranda* rights. The defendant subsequently confessed. In deciding that the defendant's statements must be suppressed, the court stated,

> "The burden is also upon the state to prove that despite the illegal entry, arrest and search, the incriminating statements and ultimate confession were acts of defendant's free will and that the primary taint of illegality was thus purged. It can be contended that the receiving of the *Miranda* warning by defendant was such an intervening circumstance indicating voluntariness. In *Brown v. Illinois*, 422 US 590, 602, 95 S Ct 2254, 45 L Ed 2d 416 (1975), as here, incriminating statements were made almost immediately upon defendant's arrest followed shortly by a more detailed statement of the crime. There the Court suppressed the statements, which it found to be the product of an invalid arrest and search, even though given after a *Miranda* warning. Such a warning is evidence which may be considered in deciding whether a statement or a confession was unaffected by an illegal arrest and search. That decision is dependent upon all the circumstances, and we believe that in the present case the warning is inadequate to relieve the obvious taint resulting from breaking in, arresting defendant, and searching the premises."

*Olson*, 287 Or at 166.

We think that here, as in *Olson*, the *Miranda* warning is "inadequate to relieve the obvious taint" of the unlawful police conduct. Given that defendant's illegal seizure led to an illegal search of defendant's person that revealed defendant's possession of a controlled substance and that that discovery, in turn, led to defendant's arrest (which triggered the giving of the *Miranda* warnings), it is impossible to conclude

that the *Miranda* warnings alone were adequate to break the causal chain between the illegal police conduct and the subsequent incriminating statements and discovery of evidence. The Court of Appeals correctly held that the trial court should have suppressed defendant's statements in response to Hunt's questions along with the evidence found in defendant's backpack.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**DURHAM, J.,** concurring.

I join the majority's answer to the narrow issues that it decides in this case. However, I do not join much of the reasoning that the majority uses to arrive at its answer, and I write separately to explain the basis for this concurrence.

This case concerns the admissibility of two categories of evidence: (1) evidence obtained from a consent search of defendant's person, and (2) statements that defendant made to the police after they advised defendant of his rights under *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), as well as other drug-related evidence obtained from defendant's backpack as a consequence of those statements to the police. The majority concludes that unlawful police conduct—an unconstitutional seizure of defendant—tainted the consent search of defendant's person and that the later delivery of *Miranda* warnings was inadequate to sever the causal link between the unlawful seizure and the incriminating statements and drug evidence found in defendant's backpack. Those admissibility determinations, according to the majority, each find their root in the conduct of the police officer in requesting defendant's consent to search his person during the unlawful seizure.

Applying *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), and its progeny, the majority decides that the trial court should have suppressed all evidence that came to light during the events that followed the seizure. The majority stresses, however, that the key issue that it decides concerning the initial consent search is a narrow one concerning causation, and

that no issue exists here about whether *Hall* was correctly decided. The majority states:

> "Before we begin our analysis of the legal issues presented in this case, we pause to observe how limited the state, as petitioner here, has chosen to make them. First, the state has not asked this court to reconsider *Hall*. Second, the state does not argue that the Court of Appeals was wrong to conclude that the state had not met *its* burden to show that the consent would have occurred independent of the illegality or that the connection between the unlawful stop and the consent was attenuated. Rather, as the state has presented the case to this court, the only issues are whether (1) defendant met his initial burden to show a minimal factual nexus between the unlawful police conduct and his consent to search, and whether (2) the giving of *Miranda* warnings was a sufficient intervening circumstance, standing alone, to mitigate the taint of the preceding unlawful police conduct on defendant's later statements about the evidence in the backpack. We turn to those issues."

348 Or at 628 (emphasis in original).

In response to the majority's narrow statement of the issue here, the dissent seeks to distinguish the factual circumstances in *Hall* from those presented here, all in an effort to demonstrate that the causal link between the unlawful stop and defendant's voluntary consent to a search of his person was weak or nonexistent. In arguing that point, the dissent acknowledges that this case presents only a question of the factual nexus between the police illegality and the consent search, and does not raise a challenge to the correctness of *Hall*:

> "This case does not require us to decide whether *Hall* was correctly decided, and the state has not asked to reexamine that decision. Rather, the state argues, and I would hold, that any causal connection in this case between the retention of defendant's identification and defendant's decision to consent is so much weaker than it was in *Hall* that we should give effect to defendant's voluntary consent to the patdown search."

348 Or at 647 (Kistler, J., dissenting) (footnote omitted).

I dissented in *Hall*, arguing that the majority there had distorted the relevant legal analysis when the police, after committing an illegality, obtain incriminating evidence against a defendant. 339 Or at 37 (Durham, J., concurring in part and dissenting in part). I contended that new mode of analysis adopted in *Hall* was not supported by any existing precedent, state or federal, and that the reasoning in *Hall* would lead to the needless suppression of evidence obtained by the police with the specific, voluntary consent of the owner or possessor of the evidence. More recently, I dissented from the court's extension of the *Hall* paradigm to the arena of the traffic stop. *State v. Rodgers/Kirkeby*, 347 Or 610, 631, 227 P3d 695 (2010) (Durham, J., dissenting).

This case specifically concerns the application of the part of the *Hall* analysis that obliged defendant to demonstrate that a factual link exists between his unlawful detention by the police officer and, later, the officer's request for consent to conduct a patdown search of defendant's person. The state raises no claim that the *Hall* court erred in creating that requirement. Given the temporal and physical circumstances of the stop and the officer's request, the majority has the better of the argument on that point. Therefore, I join the majority's conclusion that defendant met his initial burden, as described in *Hall*.

Further, I join the majority's second conclusion, which follows from its first, that a *Miranda* warning alone was not sufficient to nullify the causal link between the initial police illegality and the statements and drug-related evidence that defendant seeks to suppress. I do not join in the majority's recital at length of the rationale in the *Hall* line of cases that has nothing to do with the disposition of this case.

The court, in the future, may face other arguments that question the logic of *Hall* and its progeny in ways that this case does not. This court has stated: '

> "[W]e remain willing to reconsider a previous ruling under the Oregon Constitution whenever a party presents to us a principled argument suggesting that, in an earlier decision, this court wrongly considered or wrongly decided the issue in question. We will give particular attention to arguments that either present new information as to the meaning of

the constitutional provision at issue or that demonstrate some failure on the part of this court at the time of the earlier decision to follow its usual paradigm for considering and construing the meaning of the provision in question."

*Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54, 11 P3d 228 (2000). Counsel for any party who chooses to challenge the correctness of the decision in *Hall* in a future case is well-advised to bear in mind the guidance that this court provided in *Stranahan* for that endeavor.

For the reasons stated above, I concur in the majority's decision.

**KISTLER, J.,** dissenting.

An officer lawfully stopped a car in which defendant was a passenger. The majority holds that the officer unconstitutionally seized defendant when the officer retained defendant's identification card and that all the evidence that followed was a product of that seizure and must be suppressed. Although I agree that the officer stopped defendant without reasonable suspicion, the rest of the majority's reasoning sweeps too broadly. As an initial matter, defendant would not have left the scene of the stop, even if the officer had not retained his identification. In that circumstance, defendant's later, voluntary consent to a patdown search was sufficient to break the causal chain. Beyond that, the officer lawfully discovered evidence during a search incident to the arrest of the driver and defendant chose to answer the officer's questions about that evidence after having been advised of his *Miranda* rights. Those events occurred independently of the retention of defendant's license and were not the product of that act. This case differs in those respects from *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), and the majority errs in treating this case as if *Hall* governed it. I respectfully dissent.

The question whether a voluntary consent that follows an unconstitutional stop is a product of that stop is a fact-intensive one, and it is worth recounting the facts in this case before turning to the legal issues that they raise. One morning, a police officer lawfully stopped a car in which defendant was a passenger. The car was missing a license plate and exceeding the speed limit. The stop occurred at a

remote location in the Coast Range along Highway 26.[1] There were five people in the car (including the driver) and only a single officer. On approaching the car, the officer noticed that the driver of the car appeared to be under the influence of methamphetamine. As the officer explained:

> "[The driver's] body was contorting and twisting. She couldn't sit still. She was running her fingers through her hair at a very high and unusual rate of speed. I saw her jaw muscles * * * and her face muscles were spasming and relaxing. I asked her for her driver's license. She was making just some random statements that I really didn't hear and understand. She made a couple of comments that were basically irrelevant to anything."

The driver found her license and gave it to the officer. After giving the officer her license, the driver continued to rummage through her wallet, even though the officer had asked only for her license.

Given the driver's behavior, the officer asked her if she had any methamphetamine in the car. At that point, defendant, who was sitting in the front passenger seat, spoke up and said, "Sir, what do we have to do to rectify this so that we stop getting stopped. So that we don't get stopped anymore." The timing of defendant's question and the overly polite way in which he asked it raised the officer's suspicions. The officer asked defendant for identification, and defendant gave him a veteran's identification card. The officer took both the driver's license and defendant's identification card and put them in his car. He then asked the driver to step out of the car, spoke to her briefly, and returned to his car where he "ran a computer check on both the defendant and [the driver]." That check did not reveal any outstanding warrants for either person.

---

[1] The officer testified that the closest home "would probably be three miles away[.]" Later, the officer explained that there was one house on Saddle Mountain Road about a quarter to a half mile up that road from where it "leaves [Highway] 26." There was no testimony regarding how far Saddle Mountain Road was from the scene of the stop and thus nothing to call into question the officer's earlier testimony that the nearest home was three miles away. As defense counsel put the issue to the officer, "So as far as people in the car * * * would be able to observe by driving through that area, they're three miles from anything in one direction out there * * * [and they're]—I don't know—six or seven miles I think in the other direction." The officer answered, "Approximately. Yes, sir."

The officer went back to the car where defendant was sitting.[2] He asked defendant "if he would mind stepping out of the car and talking to [him] for a minute." Defendant said "[s]ure" and stepped out. At that point, the officer asked defendant to step to the back of the car, where the driver was seated, so that he could keep an eye on defendant, the driver, and the three other passengers who were still in the back seat of the car. As defendant walked to the back of the car, the officer noticed that defendant walked with an exaggerated limp, but he did not see any obvious signs that defendant was under the influence of any substance.

Once they reached the back of the car, the officer explained to defendant that, when he talks to someone outside of a car, he "like[s] * * * to pat them down for weapons" and then he asked defendant "for consent to pat him down." Defendant replied, " 'Yeah.' " As the officer explained, "[h]e told me that I could pat him down." As the officer started to pat defendant down, he could see from his vantage point into defendant's shirt pocket. Inside the pocket, he "saw a prescription pill bottle with no label on it[,] and [he] could see inside the pill bottle was plastic wrapping and [he] immediately suspected it was drugs." He took the bottle out of defendant's pocket and asked, "Is that the meth[,]" and defendant said, "Yeah, I guess it must be." The officer placed defendant under arrest and advised him of his *Miranda* rights.

At that point, the officer turned his attention back to the driver, whom he "ran * * * through a field sobriety test and subsequently arrested her for driving under the influence of methamphetamine." After the officer arrested the driver, he searched the car for "additional means of intoxication." During that search, the three passengers in the back seat got out of the car. One of them told the officer that there was a backpack in the car, which the passenger identified as defendant's. The officer asked defendant if there were methamphetamine in the backpack. Defendant said that there was and described the contents of the backpack in detail. The

---

[2] It is not clear when the officer returned the license to the driver and the identification card to defendant. The state, however, does not dispute that the officer did not return the identification card before he began speaking with defendant.

officer then looked in the backpack and found more methamphetamine.

Before trial, defendant moved to suppress all the evidence found during the stop. Specifically, defendant moved to suppress: (1) the methamphetamine found in the pill bottle during the patdown search; (2) defendant's statements to the officer regarding the backpack; and (3) the contents of the backpack. The trial court denied that motion, and the Court of Appeals reversed the resulting judgment of conviction.

Before turning to the issue that this case presents, it is important to note what is not at issue. Defendant does not contend that the officer lacked probable cause to stop the car for a traffic infraction, nor does he dispute that the officer acquired reasonable suspicion that the driver was under the influence of methamphetamine once he approached the car and spoke with her. Defendant has not challenged the voluntariness of his consent to the patdown search. He has not questioned the officer's testimony that the prescription bottle in defendant's shirt pocket was in plain view when the officer began to pat him down, and he has not argued that the officer acted unconstitutionally when he removed the prescription bottle from his shirt pocket and asked him about its contents. Relatedly, defendant does not argue that the officer lacked probable cause to arrest the driver for driving under the influence of methamphetamine, once she performed field sobriety tests, and he has not challenged the officer's authority to search the car for additional evidence of intoxication, as a search incident to the driver's lawful arrest. Defendant's argument accordingly reduces to the proposition that every lawful act that followed the retention of his identification must fall because it was a product of that single, initial illegality.

The state, for its part, does not dispute that the officer's retention of defendant's identification card prevented him from leaving and thus stopped defendant without reasonable suspicion. The state argues, however, that there is no causal connection between that illegality and defendant's voluntary consent to the patdown search because defendant would not have left the scene, even if the officer

had not retained his identification. It follows, the state contends, that defendant's voluntary consent to the patdown search was not the product of the prior illegality. Alternatively, the state argues that, even if the consent were the product of the retention of defendant's identification, the *Miranda* warnings that defendant subsequently received were, in the totality of the circumstances, sufficient to break the causal chain, rendering defendant's post-*Miranda* statements and the contents of the backpack admissible.

In my view, both of the state's arguments are well taken. Under this court's decisions, when the officer retained defendant's identification card, he prevented him from leaving and accordingly stopped him without reasonable suspicion. *See, e.g., State v. Thompkin*, 341 Or 368, 379, 143 P3d 530 (2006) (so reasoning). Defendant, however, also was prevented from leaving the scene of the stop for an independent and completely lawful reason. The officer lawfully had stopped the car in which defendant was riding and, on stopping the car, reasonably suspected that the driver was under the influence of methamphetamine. The stop occurred in a remote wooded location, three miles from the nearest home, and the trial court reasonably could have found that defendant would not have left the scene of the lawful stop of the car even if the officer had not retained his identification.[3] In this case, as long as the driver's car was lawfully detained, so was defendant.

As a matter of causation, two independent causes prevented defendant from leaving. One was lawful; the other was not. Under those circumstances, any causal connection between the retention of defendant's identification card and his voluntary consent to the patdown search was so faint that defendant's voluntary consent was sufficient to break the causal chain. To be sure, this court held in *Hall* that the defendant's voluntary consent that followed an unlawful stop did not break the causal chain. 339 Or at 36. In that case, however, the unlawful seizure was the only reason that the

---

[3] The majority notes in passing that the facts "do not establish that it would have been impossible, or even extremely difficult, for defendant to leave the scene." 348 Or at 631. The majority uses the wrong standard of review. Whether defendant could or would have left the scene if the officer had not retained his identification is a factual issue for the trial court, which ruled in the state's favor.

defendant in *Hall* remained at the scene. In this case, by contrast, the lawful retention of the car and its driver prevented defendant (the passenger) from leaving, without regard to whether the officer retained the defendant's identification or gave it back.

Not every causal connection, however faint, will be sufficient to disable a defendant's voluntary consent from breaking the causal chain, and the causal connection in this case is, if existent at all, far weaker than the causal connection in *Hall*. This case does not require us to decide whether *Hall* was correctly decided, and the state has not asked us to reexamine that decision. Rather, the state argues, and I would hold, that any causal connection in this case between the retention of defendant's identification and defendant's decision to consent is so much weaker than it was in *Hall* that we should give effect to defendant's voluntary consent to the patdown search.[4]

As noted, defendant does not challenge the voluntariness of his consent to the patdown search, nor has he argued that the officer did not lawfully see, in plain view, what the officer reasonably suspected was contraband once he started to conduct the patdown search. Because everything that followed defendant's voluntary consent to the patdown search was constitutionally obtained and because, in these circumstances, defendant's voluntary consent was not the product of the unlawful retention of his identification, I would hold, on that ground alone, that all the evidence that the officer discovered was admissible.

---

[4] In that connection, it is worth noting that the United States Supreme Court and almost every state supreme court that has considered the issue have held that stopping a car seizes both the driver and the passengers. *See Brendlin v. California*, 551 US 249, 257, 259 n 5, 127 S Ct 2400, 168 L Ed 2d 132 (2007) (so holding and noting the holdings of the state supreme courts). Reasonable suspicion to stop the car justifies the stop of both the driver and the passengers. *See Arizona v. Johnson*, ___ US ___ , 129 S Ct 781, 172 L Ed 2d 694 (2009) (same) (citing *Brendlin*, 551 US at 255, 263). Under those decisions, the officer's retention of defendant's identification in this case would not have constituted an unlawful stop. Rather, it simply would have been a permissible inquiry during the lawful stop of the car, the driver, and all four passengers. As a practical matter, this case is no different. The stop of *this* car stopped defendant as well and, in the circumstances of this case, the officer's retention of defendant's identification contributed nothing additional to the restraint effectively placed on defendant's freedom to leave as a result of the lawful stop of the car in which defendant was a passenger.

The majority reaches a different conclusion. It holds that, under *Hall*, a minimum factual nexus will exist between an illegality and a defendant's consent as long as the consent occurs while the unlawful stop is ongoing. The majority's holding is at odds with the reasoning in *Hall*. The question under *Hall* is not whether there is a temporal connection between the illegality and the defendant's decision to consent. Rather, the question is whether there is a causal connection. The majority's decision either assumes incorrectly that all events that occur contemporaneously are causally connected, or it dispenses with the requirement that the illegality must be the cause of the decision to consent. Either way you cut it, the majority errs.

The majority, for its part, invokes the decision in *Hall* and two cases that follow it as support for its holding. The analysis in *Hall*, however, undercuts the majority's rationale, and the two cases that follow *Hall* add nothing to the analysis. The question in *Hall* was whether evidence discovered as a result of the defendant's voluntary consent to a search "derived from a preceding violation of the defendant's rights under [Article I, section 9, of the Oregon Constitution]." 339 Or at 21. The question that the court posed in *Hall* was at base a causal one. *See id.* at 24 ("[T]he critical inquiry is whether the state obtained the evidence sought to be suppressed *as a result* of a violation of the defendant's rights under Article I, section 9.") (emphasis added). Consistently with that focus, the court described the minimum factual nexus that defendants must establish as a causal connection between the illegality and the defendant's decision to consent. *See id.* at 25 ("[A] minimum factual nexus * * * is, at minimum, * * * a 'but for' relationship[.]"). The standard that the majority announces in this case—that the illegality and the decision to consent need share only a temporal link—is inconsistent with the court's recognition in *Hall* that the connection must be causal.

To be sure, it often will be the case that consent obtained during an illegal stop also will be causally connected to the stop. But that is not always so, as this case illustrates. Any causal link in this case was so faint that defendant's voluntary consent was sufficient to break the causal chain. Not only is the majority's reasoning at odds with the analysis in

*Hall*, but this case differs factually from *Hall* in that the illegal detention in that case was the only reason that the defendant in *Hall* remained at the scene. No independent lawful reason prevented the defendant in *Hall* from leaving, and this court presumed without further discussion that there was a sufficient causal connection between the illegality and the consent to shift the burden to the state to prove independent source, inevitable discovery, attenuation, or the like. 339 Or at 36.[5]

The two other cases that the majority cites add nothing to the analysis. One case, *State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010), is factually similar to *Hall*. In that case, the illegal detention was the only reason that each defendant remained at the scene. Because no independent, lawful reason prevented either defendant from leaving, that case did not present the causation question that this case does.

The other case, *State v. Thompkin*, 341 Or 368, 143 P3d 530 (2006), is factually closer. In *Thompkin*, the defendant was a passenger in a lawfully stopped car. The police stopped the passenger (the defendant) when they retained her identification without reasonable suspicion. *Id.* at 377-79. Although the trial court's findings are not particularly clear, its findings can be read to suggest that the defendant in *Thompkin* would have remained at the scene of the lawful stop without regard to whether the police unlawfully retained her identification.[6] In that respect, *Thompkin* is factually closer to this case.

---

[5] It is worth noting that the procedural paradigm that the court announced in *Hall* is difficult to square with the reasoning in both *Hall* and other cases. The court explained in *Hall*, 339 Or at 25, and reaffirmed in *State v. Crandall*, 340 Or 645, 652, 136 P3d 30 (2006), that the fact that an illegality is the "but for" cause of a defendant's voluntary consent does not render the resulting evidence inadmissible. However, in describing how the *Hall* paradigm works, the court stated that proof of a "but for" causal connection will be sufficient to establish a minimum factual nexus and thus to presume that the consent was the product of the illegality, unless the state offers some evidence other than the defendant's voluntary consent to prove independent source, inevitable discovery, attenuation, or the like. *Hall*, 339 Or at 25. In my view, there is a substantial question whether proof of "but for" causation is by itself sufficient to disable the effect of a defendant's voluntary consent. In this case, it is especially troubling that the majority finds that something less than "but for" causation suffices to establish a minimum factual nexus.

[6] The court noted in *Thompkin* that the trial court had found that " 'there's no evidence that [the defendant] would have gotten out of the car or left the scene, that

Despite that possible similarity, *Thompkin* provides no precedential support for the majority's decision because the state never argued and this court never considered in *Thompkin* whether the possible presence of an independent, lawful reason for remaining at the scene meant that there was no minimum factual nexus between the unlawful retention of the defendant's identification and her voluntary decision to disclose evidence to the police. *See* 341 Or at 380-81. Indeed, the decision in *Thomkin* omits any discussion of whether the defendant had established a minimum factual nexus that shifted the burden to the state. *See id.* The opinion is silent on that point, and we should not treat *Thompkin's* silence as if it were binding precedent. *See Coast Range Conifers v. Board of Forestry,* 339 Or 136, 148-49, 117 P3d 990 (2005) (reaching that conclusion regarding an issue that an earlier decision could have but did not address).

As the majority ultimately recognizes, this court has assumed without discussion, both in *Hall* and also in *Rodgers/Kirkeby* and *Thompkin,* that a minimum factual nexus existed, and those cases thus provide little or no analytical help in determining what a defendant must show to establish that nexus. The majority attempts to supply the analytical deficiency in those decisions with the following explanation:

> "We think that the reason both that the court sometimes assumes without discussion that a defendant has shown the required nexus when consent occurs *during an ongoing seizure* and that no case exists holding that there is no minimum connection in such circumstances is that the existence of a minimal factual nexus is obvious in cases in which the defendant consents to a search (or takes other incriminating action) *during an illegal seizure.*"

348 Or at 633-34 (emphasis in original). In my view, the majority's explanation still leaves something to be desired. However obvious the causal connection may be in some cases, it is not obvious in every case. The majority errs in sweeping away all factual distinctions with an uncritical assertion that a minimum factual nexus will always exist when consent

she didn't feel free to leave because [the officer retained her identification].' " 341 Or at 373-74 (quoting the trial court's findings).

occurs during an illegal detention; in so doing, it incorrectly substitutes a temporal connection for a causal one.

One final point requires discussion. The majority says, in a footnote, that the state has not argued the first issue that this opinion discusses. The state, however, argued in its brief to the Court of Appeals that, under *Hall*, a defendant must show " 'at minimum, the existence of a "but for" relationship' " between the evidence sought to be suppressed and the police illegality to establish a factual nexus. Respondent's Brief at 8 (quoting *Hall*, 339 Or at 25). The state contended that the evidence in this case was not sufficient to establish even that minimal causal connection. It followed, the state reasoned, that "[t]here is no reason to suppose * * * that taking and retaining defendant's ID had any effect on his decision to consent to the patdown[.]" *Id.* at 9-10.

In this court, the state raised the same issue. It contended that, because the traffic stop was lawful and ongoing, any connection between the retention of defendant's identification and the officer's request for consent to the patdown search was not sufficient to establish even "but for" causation.[7] In my view, the state's arguments in both the Court of Appeals and this court properly raised the question whether the causal connection between the retention of defendant's identification and his consent to the patdown search was so weak that defendant's voluntary consent broke the causal chain. As explained above, on that issue, I would hold that, because the detention in this case resulted equally from a lawful and an unlawful cause, the illegality did not have a sufficient effect on defendant's voluntary decision to consent to the patdown search to prevent that decision from breaking the causal chain, even under *Hall*.

A second, more limited basis for reversing the Court of Appeals decision exists. Even if one assumes that defendant's consent to the patdown search was not sufficient to break the causal chain, four later events, viewed collectively,

---

[7] In this court, the state focused on the absence of a "but for" causal connection between the retention of defendant's identification and the officer's request for consent, but it did so presumably because that was what the Court of Appeals had held was the correct focus in determining the existence of a minimal causal connection under *Hall*. *See State v. Ayles*, 220 Or App 606, 612, 188 P3d 378 (2008).

were. First, the officer lawfully arrested the driver for driving under the influence of methamphetamine. Second, the officer lawfully searched the car for more evidence of intoxicants incident to his lawful arrest of the driver. *See State v. Caraher*, 293 Or 741, 759, 653 P2d 942 (1982) (authorizing a search incident to arrest when "it is relevant to the crime for which defendant is being arrested and so long as it is reasonable in light of all the facts").[8] Third, during that search, one of the passengers got out the car, told the officer that there was a backpack in the car, and identified it as defendant's.[9] Fourth, the officer asked defendant whether there was methamphetamine in the backpack, and defendant, having previously received *Miranda* warnings, chose to answer the officer's questions.

Even if defendant's voluntary consent to the patdown did not break the causal chain, his receipt of the *Miranda* warnings did. Admittedly, giving a defendant *Miranda* warnings does not always break the causal connection between an Article I, section 9, violation, and a defendant's subsequent statements. *See Hall*, 339 Or at 35 (identifying several considerations, in addition to *Miranda* warnings, to account for in assessing a causal connection); *see Brown v. Illinois*, 422 US 590, 603, 95 S Ct 2254, 45 L Ed 2d 416 (1975) ("*Miranda* warnings, *alone* and *per se*, cannot always make the act sufficiently a product of freewill to break, for Fourth amendment purposes, the causal connection[.]"). Rather, determining whether those warnings were sufficient to break "a causal connection requires examination of the specific facts at issue in a particular case." *Hall*, 339 Or at 35. That is, the question whether the warnings purged the

---

[8] This court recognized in *State v. Owens*, 302 Or 196, 729 P2d 524 (1986), that, under Article I, section 9, a search incident to arrest permits officers to look in the trunk of the defendant's car for evidence of the crime for which they had arrested him. *See id.* at 203-04 (quoting, with approval, an earlier case for that proposition).

[9] Under Article I, section 9, an officer may look for evidence of the crime for which he or she arrested a person to the extent that the evidence "reasonably could be concealed on the arrestee's person or in the belongings in [the arrestee's] immediate possession at the time of the arrest." *Owens*, 302 Or at 200. In this case, the state has not argued that the driver was in possession of defendant's backpack at the time of her arrest. Accordingly, although the officer lawfully discovered defendant's backpack as part of a search incident to the driver's arrest, he could not, incident to the driver's arrest, go further and search the contents of defendant's backpack.

taint requires consideration of the nature and the extent of the taint.

Here, any taint was minimal. The only illegality that defendant has identified was the fact that the officer's retention of defendant's identification card prevented defendant from leaving and thus stopped him without reasonable suspicion. As explained above, however, defendant could not leave for an independent, completely lawful reason. In those circumstances, the effect of retaining his identification card was minimal, if not nonexistent. The subsequent, independent discovery of defendant's backpack and the *Miranda* warnings that defendant received were sufficient to attenuate any taint deriving from the officer's retention of his identification. If defendant's voluntary statements were not the product of the officer's retention of defendant's identification, then the subsequent search of his backpack was lawful, based solely on those statements, either under the automobile exception or as a search incident to defendant's arrest.

Relying on *State v. Olson*, 287 Or 157, 598 P2d 670 (1979), the majority reaches a different conclusion. However, this is not a case in which the officers broke into the defendant's house without justification and roused the defendant and his companion from their bed, as they did in *Olson. Cf. id.* at 159. Nor is this a case in which the defendant, on entering his home, found an officer unlawfully inside his home pointing a gun at him and saying, "Don't move, you are under arrest." *Cf. Brown*, 422 US at 592. In that case, neither the officers' entry into the defendant's house nor their arrest of him at gun point was constitutionally justified. *Id.* at 596. In those cases, this court and the United States Supreme Court respectively held that the mere fact that the officer gave the defendants *Miranda* warnings before the defendants made incriminating statements was not sufficient to purge the taint of the officers' unconstitutional entries into the defendants' homes. *Olson*, 287 Or at 166; *see also Brown*, 422 US at 603. In light of the nature and severity of the Fourth Amendment and Article I, section 9, violations in those cases, something more than *Miranda* warnings was required. *Olson*, 287 Or at 166; *Brown*, 422 US at 604-05.

In this case, by contrast, the nature and severity of the violation was minimal. The officer retained defendant's identification and prevented him from leaving in a situation where defendant had no ability to go anywhere until the officer concluded his lawful stop of the car. The degree of attenuation necessary to purge the taint varies with the extent of the taint, and where, as here, any taint is minimal, the required degree of attenuation is correspondingly reduced. The point has nothing to do with deterrence. Rather, under a rights-based suppression analysis, the degree of attenuation necessary to purge the taint (and thus restore the defendant to the position he or she would have been in had no constitutional violation occurred) varies with the extent, nature, and severity of any illegality.[10] Any other rationale would give a constitutional violation that had only minimal effect far greater reach than either the constitution requires or good sense warrants. Because I would uphold the trial court's judgment in this case, I respectfully dissent.

Balmer and Linder, JJ., join in this opinion.

---

[10] This court has rejected, in a footnote and in *dicta*, any reliance on the purpose and flagrancy of the constitutional violation to the extent that it bears on deterrence. *Hall*, 339 Or at 35 n 21. That reasoning is consistent with the rights-based suppression analysis that this court has adopted. To the extent, however, that the *dictum* in *Hall* goes further and suggests that the nature of the violation is irrelevant to the degree of attenuation necessary to purge the taint flowing from that violation, the suggestion lacks persuasive value. Not only is the suggestion *dictum* and thus not binding, but the assumption that underlies it—that all constitutional violations have the same effect—is erroneous.