## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## KATRINA MARIE OLENDORFF,
*Defendant-Appellant.*

Douglas County Circuit Court
11CR0882FE; A152068

341 P3d 779

Mary M. Reese, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael S. Shin, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were

Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Mooney, Judge pro tempore.

HADLOCK, J.

## HADLOCK, J.

Defendant appeals a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894, and driving while suspended, ORS 811.182, challenging only the first of those convictions. That conviction followed an incident in which police officers seized defendant's purse after arresting her for a traffic offense. A later inventory of the purse revealed a bindle containing methamphetamine. The trial court denied defendant's motion to suppress evidence of the methamphetamine and of statements that she made about the contents of the purse. Defendant argues that the police unlawfully seized the purse because they did not honor her request to give it to another person at the scene of her arrest. She also argues that her statements were the product of exploitation of that unlawful seizure. We agree on both points and, therefore, reverse the conviction for unlawful possession of methamphetamine.

The facts are not in dispute. A month before the incident at issue in this case, Corporal Dahl arrested defendant for driving while suspended. Defendant consented to a search of the car and her purse. That search evidently did not reveal any weapons or contraband. Dahl allowed defendant to call her father to come pick up the car (and defendant's children, who were in the car), and he gave defendant's purse to her father as well. Defendant was cited, booked, and then released.

A month later, Dahl saw defendant's car parked at the home of her former boyfriend Keller. Dahl was aware of defendant's relationship with Keller and that Keller was the father of one of defendant's children. He also knew that both defendant and Keller had previously been involved in illegal drug activity and that Keller was currently being investigated for dealing methamphetamine. Dahl verified that defendant's license was still suspended, and then he parked nearby and waited. Later, he saw defendant pull out of the driveway and drive toward him.

Defendant saw Dahl when she drove past him, and she immediately pulled into a parking lot right around the corner from Keller's home and parked the car. Dahl pulled

in behind her. Officer Allen, who had been parked nearby, pulled into the parking lot a few seconds later. Dahl walked up to defendant and asked why she was driving. According to Dahl, defendant was "immediately more aggressive and immediately more pissed off" about being pulled over than she had been the previous time, though she was not physically aggressive and did not appear to be under the influence of any controlled substance. Nothing that defendant did made Dahl concerned about his safety.

Defendant asked if she could call her mother to pick up the car so it would not be impounded. Dahl told her that she could, and defendant started making telephone calls, eventually calling both her mother and Keller. Dahl asked defendant if he could search her car. Defendant agreed, grabbed her purse, and got out of the car. She stood by Allen's patrol car, with her purse on her shoulder, and continued to talk on the phone. When defendant finished her calls, Allen asked for her consent to search the purse. Defendant declined, saying that she had dirty underwear in the purse and that she wanted to give the purse to her mother when she came for the car.

Dahl did not find anything illegal in defendant's car. When he finished searching, he told Allen to handcuff defendant and put her in the back of Dahl's patrol car. Allen did so, advised defendant of her *Miranda* rights, and then put her purse in the trunk of the patrol car.

As Allen was putting the purse in the trunk, Keller and another man were approaching from Keller's house. When they arrived, defendant asked Dahl to give her keys and purse to Keller. Dahl knew that Keller's license had also been suspended, so he would not release the car to him. He also refused to give Keller the purse. He told defendant, "[B]ased on what I know about you, it's pretty obvious by the way you're acting and by what happened last time that there's something illegal in the purse." He said that he knew about defendant's history of drug use and that she had been at Keller's house. He told her, "It's pretty obvious there's something in there, probably drug related." He also told her that she could be charged with supplying contraband to the jail if she did not tell him about any drugs she had so that

he could remove them from the purse before they went to the jail. After Dahl again asserted, "There's something in there," defendant replied, "Yes." Dahl asked what it was, and defendant said, "I'm not going to tell you about it."

At that point, Dahl allowed defendant to give her keys to Keller, who said he would wait there until defendant's mother arrived. Allen then left the scene, and Dahl took defendant to the Douglas County Jail. A deputy inventoried the purse at the jail and found a small amount of methamphetamine. Defendant was charged with unlawful possession of methamphetamine and driving while suspended.

Before trial, defendant moved to suppress the evidence found in her purse and her statements about it. At the suppression hearing, Dahl explained that he had refused to release defendant's purse to Keller for several reasons. First, he said that he had suspected that defendant had drugs in the purse, given the fact that she had consented to having the purse searched only a month earlier, the difference in her demeanor between the two encounters, her "pretty adamant" refusal to consent this time, her history of drug use, and the fact that she had just come from Keller's house. Dahl also testified that officer-safety concerns were part of his decision because "all kinds of things *** could be in a purse," including weapons, and if there were dangerous items in the purse, the officers "didn't want to give it to [Keller] on the scene."

Allen also testified at the suppression hearing. He described the encounter with defendant at the point that she consented to the search of her car as "pretty laid back" and said that, while she was standing by his patrol car talking on her phone, nothing about her behavior or demeanor caused him to believe that he needed to "separate her from her purse" for safety reasons. Allen also testified about the decision not to release the purse to Keller. He cited both officer safety and liability as reasons for not releasing the purse:

> "Well, the biggest reason is officer safety. She wouldn't let us search her purse and so I'm not about to hand a purse off to somebody that could potentially, you know, contain a weapon or anything else. Nor will I be liable for what's

inside that purse if something were to come up missing. I would never ever release a purse to anybody without looking through it[.]"

Allen stated that the decision whether to release a purse without searching it is left to the discretion of each officer. He said that he had never released a purse without looking through it, adding that, if he arrests someone with a purse, he either searches it or it "goes to the jail with that person," where he knew that it would be inventoried. According to Allen, the fact that defendant's purse was already in the trunk of Dahl's patrol car when defendant asked Dahl to give it to Keller was not a factor in the decision not to release it.

The trial court denied the motion to suppress. It found that Dahl and Allen had reasonably suspected that defendant might have a weapon or means of escape in her purse. Accordingly, the court concluded, the officers' action in placing the purse in the trunk of the patrol car fell within the "search incident to arrest" exception to the warrant requirement. The court did not address defendant's argument that the officers should have granted her request to have the purse released to Keller, apparently accepting the idea that, once the officers lawfully came into possession of defendant's purse, they were entitled to retain it. The court then concluded that the purse had been inventoried lawfully at the jail. With respect to defendant's statement to Dahl that something illegal was in her purse, the court ruled that she had made the statement voluntarily and that evidence of the statement was therefore admissible. After a jury trial, defendant was convicted of both charges.

On appeal, defendant assigns error to the denial of her motion to suppress. She argues that Dahl and Allen unlawfully seized her purse and that the inventory was therefore also unlawful. She also contends that her statement to Dahl about the contents of the purse was a product of exploitation of the unlawful seizure or, alternatively, that Dahl coerced her into making the statement by threatening to charge her with supplying contraband. The state contends that the officers' seizure of defendant's purse was lawful and that her statements were not impermissibly coerced.

At the outset, the parties disagree about when the officers seized defendant's purse. "A 'seizure' occurs when there is a significant interference with a person's possessory or ownership interests in property." *State v. Owens*, 302 Or 196, 207, 729 P2d 524 (1986). Here, the state asserts that defendant's purse was seized when Allen put it into the trunk of Dahl's patrol car and that the seizure was *then* lawful because the officers' only reasonable choice was to transport the purse with defendant to jail. Moreover, the state contends, once the officers had lawfully seized defendant's purse, they had no obligation to release it at defendant's request. The state does not base that argument on any case-specific circumstances. Rather, the state argues generally that, once an officer has lawfully seized property that was "attached to" a person when that person was arrested, the officer need not later release the property at the arrestee's request.

Defendant does not agree that her purse was seized when the officers arrested her and put the purse in the patrol car's trunk. Defendant asserts that she, like most arrestees, would rather have her personal items transported with her to jail, not left unattended at the scene of her arrest. She also acknowledges that officers have authority to conduct arrests safely and that Dahl and Allen could reasonably choose to separate her from her purse and its contents when they seated her in the back of the patrol car. *Cf. State ex rel Juv. Dept. v. Singh*, 151 Or App 223, 228, 949 P2d 303 (1997) (noting the permissibility of a pat-down or limited search for weapons whenever a person is taken into custody and further observing that "[t]he proximity of an officer to an arrestee during arrest and handcuffing makes it imperative that the arrestee not have immediate access to a weapon or tool of escape that might be easily concealed and reachable even if the arrestee were handcuffed"). Defendant concludes that, because she *wanted* to take the purse with her to jail, the officers did not interfere with her possessory interests when they accommodated her wishes and took the reasonable step of putting the purse in the trunk of the car for transport. According to defendant, the officers did not seize the purse until later, when they retained possession of it instead of releasing it to Keller when defendant made that

request. And at that point, defendant contends, officer-safety concerns did not justify the seizure because the state did not establish either that Dahl or Allen subjectively believed that her purse contained a weapon or that such a belief would have been objectively reasonable.

In short, defendant contends that the purse was not seized until Dahl refused to give it to Keller and that, at that point, there was no justification for the seizure because giving the purse to Keller would have posed no threat. The state contends that officers were entitled to seize the purse by putting it into the trunk for safe transport; it further argues that, once the purse was seized, the officers needed no additional justification to retain it.

For the reasons set out below, we conclude that this case does not require us to determine whether a "seizure" occurred for purposes of Article I, section 9, of the Oregon Constitution when Allen placed defendant's purse in the trunk of Dahl's patrol car. The constitutional analysis does not depend on whether that initial action was a seizure. Neither party contends that the officers' action was unlawful at that point. Either the act was a justified seizure (as the state contends) or the act was not a seizure because it did not meaningfully interfere with defendant's possessory interests (as defendant contends). The real question, then, is whether the officers acted lawfully by denying defendant's later request to release the purse to Keller, after he arrived. In that regard, defendant argues that, although the officers had authority to keep the purse from her, they were permitted to interfere with her possessory interest only to the extent minimally necessary to conduct a safe arrest, and that the justification for that interference dissipated when Keller arrived on scene and defendant asked that he be given her purse. The state responds that, once an officer has lawfully seized property—at least "property that was attached to the arrestee's person at the time of arrest"—the officer may retain it.

Both parties rely on *State v. Komas*, 170 Or App 468, 13 P3d 157 (2000). In that case, a Portland police officer arrested the defendant, who was wearing a shoulder bag, and handcuffed him. *Id.* at 475. The defendant asked one

of the officers if he could give the shoulder bag to a friend who was in a crowd that was gathering at the scene. *Id.* at 471. Because of the way in which the shoulder bag was constructed and the defendant was handcuffed, the bag could not be taken from the defendant without either destroying the bag's strap or uncuffing the defendant. "The officer decided not to remove the handcuffs, and instead, knowing that the bag would accompany [the] defendant into the [patrol] car, he opened it to inventory its contents," and found illegal drugs. *Id.* The defendant unsuccessfully moved to suppress the evidence from the shoulder bag arguing, in part, that the officers should have released the shoulder bag to another person as the defendant had requested. In that regard, the defendant appears to have argued primarily that the city's inventory ordinance was invalid because it allowed an officer discretion about whether to comply with an arrestee's request to give property to a friend before being taken to jail. *Id.* at 476. We rejected that argument, concluding that "inventory policies govern the examination of property and not its seizure" and, therefore, that the ordinance was not invalid because it did not limit officer "discretion about whether to release seized property to a third person." *Id.* at 478. In a footnote, we also observed, "We have not been apprised of any constitutional principle that would have required [the officer] to remove the handcuffs, particularly in light of the increasing hostility of the crowd." *Id.* at 475 n 3.

Defendant reads the *Komas* footnote to say that no constitutional principle required the officer *to remove the defendant's handcuffs* and, therefore, the officer was not required to release the bag. According to defendant, given the "increasing hostility of the crowd" and the risk that removing the handcuffs could have presented, the *Komas* officer acted within his discretion in deciding not to remove them. In her view, the fact that the defendant's bag could not be taken from him was incidental to that lawful decision, and, thus, the officer's refusal to release the bag was reasonable.

The state reads *Komas* to say something very different—that the officer did not have an affirmative duty *to release the defendant's bag* to another person and, therefore, was not required to remove the handcuffs so that the

bag could be taken off the defendant's shoulder. From that, the state infers the "general principle that when an arrestee requests release of property that was attached to the arrestee's person at the time of arrest and therefore lawfully seized by the arresting officer, the officer does not have an affirmative duty to release the property."

The *Komas* footnote does not bear the weight that the state places on it. Our holding in that case related to the validity of the city's inventory policy and whether such policies are required to limit officers' discretion in deciding when to release an arrestee's property to another person at the arrestee's request. We did not analyze more generally the circumstances under which officers may or may not deny arrestees' requests that their property be released.

In our view, defendant has the better view of the footnote from *Komas*. In that passage, we focused on the hostility of the gathering crowd, strongly suggesting that we had officer-safety principles in mind when we noted the absence of citation to a constitutional principle that would have required officers to remove the defendant's handcuffs. Nothing in the footnote suggests that we intended to announce a principle that, once police officers have arrested a person, they need never release the arrestee's personal belongings to another person upon the arrestee's request.

Other than its misplaced reliance on *Komas*, the state cites no other authority in support of its position that, once a police officer has lawfully taken control of property that was "attached to" an arrestee, the officer is never required to release that property to another person at the arrestee's request, and our research has revealed none. The state's position raises the question, when exactly does the property have to be returned? Plainly, an arrest and concomitant taking of the arrestee's personal property (whether or not that taking constitutes a seizure) does not fully and permanently divest the arrestee of his or her interest in that property: unless it is contraband or otherwise subject to forfeiture, the police will have to give it back eventually.

Our opinion in *State v. Johnson*, 177 Or App 244, 35 P3d 1024 (2001), makes that point. In that case, the defendant was arrested on a probation violation. The police

suspected that he had committed an unrelated homicide, and, after interviewing him, they seized his clothing and boots as evidence in the homicide investigation. The defendant later sought to suppress that evidence, arguing that the warrantless seizure was unlawful. The state conceded that the seizure was unlawful but argued that the evidence would inevitably have been discovered because, had it not been seized after the interview, it would have been taken into inventory at the jail. We accepted the premise that the evidence would have been inventoried and held at the jail for institutional purposes, *i.e.*, "to control what enters the facility and what items those who are incarcerated may possess." *Id.* at 251. Nonetheless, we rejected the state's conclusion that investigators inevitably would have later discovered the evidence:

> "The testimony does not address how long the clothing would have been kept in the jail, whether it would have been released to a relative or friend of defendant's if he had so requested, or any steps that the police would have had to take to obtain a transfer of items in the jail's possession. Those are all things that defendant could have done with the clothes, because they remained his property while he was in custody."

*Id.* at 250. Our holding in *Johnson* was based on the principle that the government may not indefinitely retain property that it lawfully has taken from an arrestee; at some point, the justification for that retention may no longer exist.

Although *Johnson* involved property impounded at a jail (hypothetically) rather than property taken from an arrestee before transport to jail, the same principle applies. The officers' retention of defendant's purse after she asked for it to be released—whether that retention was the *continuation* of a seizure that already had occurred or was the first point at which the purse was seized—was lawful only if some exception to the warrant requirement applied. The original justification for placing the purse in the trunk of the patrol car no longer existed: the officers no longer were faced with a choice between transporting the purse to jail along with defendant in a safe manner (as she desired) or leaving it unattended at the scene of the arrest, contrary to

her wishes. In other words, once defendant gave the officers another option—releasing the purse to Keller pursuant to defendant's request—their original justification for taking the purse from defendant dissipated. *Cf. State v. Rodgers/ Kirkeby*, 347 Or 610, 623, 227 P3d 695 (2010) ("Police authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been *** a traffic infraction. Police authority to detain a motorist dissipates when the investigation reasonably related to the traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed."). Thus, the officer's continued retention of the purse was lawful only if it was justified by some exception to the warrant requirement under the circumstances that existed once defendant asked the officers to give the purse to Keller.

Before addressing that issue further, we pause to note what the state does *not* argue on appeal (and, as discussed below, what the trial court did not decide). The state does not argue that the officers' refusal to give Keller the purse (or, implicitly, to release it only if he could look inside first) was justified by officer-safety concerns that existed after Keller arrived on scene. *Cf. Komas*, 170 Or App at 472-74 (officer's stated safety concerns were not sufficient to justify him in searching the arrested defendant's wallet for weapons before releasing the wallet to one of the defendant's friends). Nor does the state argue that the seizure of the purse resulting from their refusal to release it to Keller (whether an initial seizure or a continuation of the initial seizure, the justification for which had partly dissipated) could have been justified as incident to defendant's arrest in the same way that a search may be permissible incident to an arrest because, considering all the circumstances, it is "necessary to protect the arresting officers, to prevent the destruction of evidence, or to discover evidence related to the crime for which [defendant was] under arrest." *State v. Newport*, 204 Or App 489, 493, 130 P3d 792 (2006); *cf. State v. Washington*, 265 Or App 532, 536, 335 P3d 877 (2014) ("Article I, section 9, authorizes a search incident to arrest for three purposes: (1) to protect the officer's safety; (2) to prevent the destruction of evidence; and (3) to discover

evidence of the crime of arrest."). The state also does not point to any other sort of exigency that would have justified the warrantless seizure. Rather, as noted above, the state simply insists that, because (in its view) the officers had lawfully seized the purse at the outset of the encounter, they were entitled to keep it notwithstanding defendant's request that it be released. That argument cannot be squared with cases discussing the requirement that officers terminate searches and seizures when the justification for them dissipates. *See, e.g., Rodgers/Kirkeby*, 347 Or at 623 (discussing dissipation of justification for a traffic stop); *State v. Stanley*, 223 Or App 1, 6, 195 P3d 454 (2008), *rev den*, 347 Or 446 (2009) (discussing how safety concerns may dissipate during the course of an officer's encounter with a suspect); *State v. Ford*, 220 Or App 247, 251, 185 P3d 550 (2008) (discussing a person's right to revoke consent that the person has given to a search).

The state's analysis mirrors that of the trial court, which did not address whether officer-safety concerns or any other circumstances justified the officers' refusal to give Keller the purse pursuant to defendant's request. Instead, the court appears to have concluded that, as the state argues on appeal, once the officers lawfully took defendant's purse and put it in the trunk of the patrol car, they were entitled to retain it regardless of defendant's later request for its release. For the reasons we have discussed, that conclusion is incorrect. Once defendant asked the officers to release her purse to Keller, the officers could deny that request—thereby either effecting or continuing a seizure—only if the denial was justified by some exception to the search warrant requirement. As noted, the state does not argue that any such justification existed (in its mistaken view, no justification was necessary). Accordingly, the state has not established that the warrantless seizure, which resulted in the purse being transported to the jail and inventoried, was lawful. We therefore conclude that the trial court erred when it denied defendant's motion to suppress the evidence that was found inside the purse.

We turn to defendant's second assignment of error. Defendant asserts that the trial court erred in denying her motion to suppress her admission to Dahl that there was

"something" illegal in her purse. Defendant made that statement only after Dahl (1) refused defendant's request that he give Keller the purse and (2) told defendant that she could be charged with supplying contraband to the jail if she did not tell him about any drugs she had so that he could remove them from the purse before taking her to jail. Thus, defendant argues, Dahl exploited the unlawful seizure of the purse to obtain her admission by putting her in the position of having to either admit that the purse contained contraband or risk prosecution for supplying contraband to the jail.[1] *Cf. State v. Unger*, 356 Or 59, 75, 333 P3d 1009 (2014) (when a defendant has established that an illegal search or seizure occurred "and challenges the validity of his or her subsequent consent to a search, the state bears the burden of demonstrating that (1) the consent was voluntary; and (2) the voluntary consent was not the product of police exploitation of the illegal stop or search"); *State v. Ayles*, 348 Or 622, 327 P3d 805 (2010) (applying exploitation analysis to the determination of whether a person's incriminating statements must be suppressed because they were the product of an unlawful detention). In response, the state argues only that the seizure was not unlawful, so her admission was not tainted by it. That argument is unavailing in light of our resolution of the seizure question. The state does not further argue that Dahl did not obtain defendant's statements by exploiting any illegal seizure that had occurred. The state's reticence in that regard is understandable, given the circumstances outlined above, which demonstrate that Dahl took advantage of the unlawful seizure by putting defendant in the position of having to choose between disclosing the contents of her purse and risking the prosecution that Dahl said could follow if defendant's purse arrived at the jail with drugs inside it. *See generally Unger*, 356 Or at 80 (describing court's task as determining "whether police 'exploited' or 'took advantage of' or 'traded on' their unlawful conduct" to obtain a person's consent to search). It follows that defendant's statements must be suppressed.

---

[1] Defendant also argues that putting her in that position constituted unlawful coercion, in violation of Article I, section 12, of the Oregon Constitution, because she could not, in fact, have been prosecuted for supplying contraband. We need not address that alternative argument.

Conviction for possession of methamphetamine reversed and remanded; remanded for resentencing; otherwise affirmed.