Submitted on remand from the Oregon Supreme Court July 22, reversed and remanded December 9, 2015, petition for review denied April 7, 2016 (359 Or 39)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## WILLIAM RICK DELONG,
*Defendant-Appellant.*

Douglas County Circuit Court
09CR1050FE; A146907

365 P3d 591

Peter Gartlan, Chief Defender, and Ryan T. O'Connor, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Susan G. Howe, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

This criminal appeal is before us on remand from the Oregon Supreme Court, *State v. Delong*, 260 Or App 718, 320 P3d 653 (2014) (*Delong I*), rev'd and rem'd, 357 Or 365, 350 P3d 433 (2015) (*Delong II*). The issues on remand are narrow. After handcuffing defendant during a traffic stop, a deputy sheriff asked defendant whether there was anything in his car that the police "should be concerned about," but he failed to advise defendant of his *Miranda* rights, in violation of Article I, section 12, of the Oregon Constitution.[1] Defendant responded by saying "no" and then offering that the deputies could "search the vehicle." A deputy searched the car, found a fanny pack, and opened it, revealing drugs and drug paraphernalia. When confronted with the contraband and after receiving belated *Miranda* warnings, defendant made admissions.

The Supreme Court has remanded for us to address two issues that we did not reach in *Delong I*: (1) whether the search of the fanny pack exceeded the scope of defendant's invitation to search, as defendant contends, and (2) whether the statements that defendant made to the deputy after receiving belated *Miranda* warnings were admissible, in light of the Supreme Court's conclusion that those statements did not unlawfully derive from the Article I, section 12, violation. *Delong II*, 357 Or at 385. We conclude that the deputy's search exceeded the scope of defendant's consent to search his car, and, therefore, the physical evidence found in the fanny pack must be suppressed. As a result, the trial court erred in admitting that evidence. We also conclude that defendant's subsequent statements are not admissible because the *Miranda* warnings that the deputy eventually administered, although accurate and effective, did not attenuate the taint of the preceding unlawful search. Therefore, the trial court erred in admitting those statements. Accordingly, we reverse and remand.

We take the facts from the opinions in *Delong I* and *Delong II* and the trial court record. A deputy sheriff,

---

[1] Article I, section 12, provides that "[n]o person shall be put in jeopardy twice for the same offence [*sic*], nor be compelled in any criminal prosecution to testify against himself."

Sergeant Robeson, stopped defendant for a seat belt traffic violation. *See* ORS 811.210 (requiring that drivers wear seat belts). Robeson had been following defendant and had observed that defendant appeared to be trying to avoid him. In response to Robeson's request for his license, registration, and proof of insurance, defendant

"gave Robeson his name but could not produce a driver's license or other picture identification. Driving without a license is a traffic offense; however, it is a defense to that charge that the driver in fact had a valid license. *See* ORS 807.570. Robeson sought to determine defendant's identity so that he could see if defendant in fact had a valid license. * * * Robeson also wanted to identify defendant to see if there were a reason why defendant apparently had sought to avoid him; specifically, Robeson wanted to see if there were an outstanding warrant for defendant's arrest.

"There was a passenger in defendant's car, and Robeson removed defendant from his car, frisked and handcuffed him, and put him in the backseat of the patrol car before asking him some background questions to verify his identity. At that point, Robeson had not advised defendant of his *Miranda* rights."

*Delong II*, 357 Or at 367-68 (footnote omitted).

A second deputy, Poe, arrived to assist around the time that Robeson was taking defendant into custody.

"Robeson and Poe both attempted to identify defendant. Robeson asked defendant questions about his identity and filled out a form based on defendant's responses. Defendant told Robeson that he was from Utah and gave him other identifying information, which Robeson then gave to dispatch to search for an Oregon or Utah driver's license. Meanwhile, Poe used his in-car computer to search for more information about defendant, including looking for [outstanding] warrants."

*Delong I*, 260 Or App at 720.

Robeson believed, generally, that defendant was not being truthful and that "something [was] going on." "Before dispatch responded, Robeson further asked defendant," in Robeson's words, "whether there was 'anything in

the vehicle that we should be concerned about.'" *Id.* at 721. Defendant responded "'no,'" and stated that "'if [the deputies] wanted to search the vehicle, [they] could.'" *Delong II*, 357 Or at 368. Defendant testified that Robeson asked "'[I]f he could search—if I minded if he searched the vehicle.'" *Id.* at 368 n 4. Defendant testified that he responded, "'I don't care but I got a whole bunch of stuff in the trunk of the car. * * * I'd like you to put it back when you're done.'" *Id.*

"Poe found that there was a restraining order entered against defendant and informed Robeson." *Delong I*, 260 Or App at 721. Robeson "then told Poe about defendant's consent to search the car. Poe conducted the search while Robeson interviewed [the passenger]. Among other things, Poe found a fanny pack under the passenger seat." *Id.* He showed it to the passenger and asked if it belonged to her. "She said that it did not belong to her. Poe then opened the fanny pack and found several small zip-lock plastic bags, a pill bottle, and plastic straws, all containing a white powder residue." *Id.*

"Poe and Robeson then returned to defendant after a third deputy, Thornton, arrived to assist. Poe gave defendant *Miranda* warnings and asked questions about what Poe had found in the car. Defendant then made incriminating statements, including admitting that the fanny pack was his and that there were drug paraphernalia in it. Thornton's field test on one of the plastic bags indicated that the white residue it contained was methamphetamine."

*Id.*

The trial court denied defendant's motion to suppress defendant's statements and the physical evidence, and defendant was then convicted of a drug charge. *Id.* at 721-22. On appeal, we reversed, concluding that defendant's unwarned statement offering consent to a search was the result of the Article I, section 12, violation when the deputy took defendant into custody and placed him in the back of the patrol car. *Id.* at 726-27. We did not reach defendant's arguments that Poe's search of the fanny pack exceeded the scope of defendant's consent to search the vehicle, and that, therefore, the physical evidence discovered and defendant's subsequent statements must be suppressed.

On review, the Supreme Court reversed our decision. *Delong II*, 357 Or at 386. The court concluded that, under the totality of the circumstances, the taint flowing from the Article I, section 12, violation was attenuated when defendant invited the deputies to search the car. *Id.* at 378-80. The court, therefore, directed us to first "resolve defendant's argument that the officer's search exceeded the scope of defendant's invitation" and, if the search did not exceed the scope of consent, to determine "whether the statements that defendant made to the deputy after receiving belated *Miranda* warnings were admissible." *Id.* at 385. On the other hand, the Supreme Court stated, if the search of the fanny pack "exceeded the scope of defendant's consent, then the question will be" whether "the belated *Miranda* warnings were effective." *Id.* at 386.

Whether a search exceeded the scope of a defendant's consent is a question of law. *State v. Arroyo-Sotelo*, 131 Or App 290, 295, 884 P2d 901 (1994). "Our task * * * is to determine whether the trial court's factual findings, supported by the record, are adequate to sustain its legal conclusion that [the officer] acted within the scope of defendant's consent." *Id.* "When the state relies on consent to support a search, it must prove by a preponderance of the evidence that the police officer conducting the search complied with any limitation on the scope of the defendant's consent." *State v. Lamoreux*, 271 Or App 757, 760, 354 P3d 717 (2015) (citing *State v. Fugate*, 210 Or App 8, 13, 150 P3d 409 (2006)). Evidence obtained outside the scope of consent to a warrantless consent search must be suppressed. *See State v. Jacobsen*, 142 Or App 341, 350, 922 P2d 677 (1996).

The police must have a specific constitutional justification for a warrantless search of a closed container within a car. *See, e.g., id.* at 346 (stating that, absent a constitutional basis to justify a search of a zipped duffel bag in a car, evidence inside the duffel bag must be suppressed). That is so because Article I, section 9, of the Oregon Constitution protects a person's separate privacy interests in a vehicle and in items within that vehicle. *See, e.g., State v. Kruchek*, 156 Or App 617, 629 n 2, 969 P2d 386 (1998), *aff'd*, 331 Or 664, 20 P3d 180 (2001) (Edmonds, J., concurring) (construing

*Jacobsen* as holding that, "when an owner of an automobile consents to the general sweep of his vehicle, he nonetheless retains a privacy interest in the contents of a zipped duffel bag inside the vehicle"). Therefore, the police must justify a warrantless invasion of each separate privacy interest. When the police rely on consent to search a vehicle, that consent will justify a warrantless search of a closed container within the vehicle only when the scope of consent can be reasonably understood to extend to the container. *See, e.g., Lamoreux,* 271 Or App at 763. Here, the state contends that the search of the fanny pack was conducted within the scope of defendant's consent to a search.

The scope of consent "is determined by reference to what a typical, reasonable person would have understood by the exchange between the officer and the suspect * * * in light of the totality of the circumstances surrounding the grant of consent in a particular case." *State v. Harvey,* 194 Or App 102, 106, 93 P3d 828, *rev den,* 337 Or 657 (2004) (internal quotation marks omitted). "The specific request that the officer made, the stated object of the search, and the surrounding circumstances all bear on our determination of the scope of a person's consent." *Fugate,* 210 Or App at 13.

"One of the best indicators of the intended scope of a search authorized by consent is the content of the request for consent." *Arroyo-Sotelo,* 131 Or App at 296. In this case, the deputy did not, strictly speaking, "request" consent. At most, his question regarding "concern[ing]" items in the car prompted defendant's invitation to search the car. *Delong II,* 357 Or at 376. However, like an express request for consent, the deputy's statement set the initial terms for the grant of consent, by indicating the scope of the deputy's interest in the car. *See Arroyo-Sotelo,* 131 Or App at 300, 300 n 2 (Haselton, J., concurring) (analogizing the granting of consent to the formation of a contract and stating that "[i]n requesting consent, agents of the state must clearly identify the intended scope and object of their search or bear the risk of any imprecision"). Therefore, the deputy's initial statement is analogous to a request for consent under our scope-of-consent case law.

The content of the request for consent can be express or implied by the circumstances. *See Lamoreux,* 271 Or App at 763 (looking to facts tacitly known to the defendant and the officer to interpret the request for consent). "'When a request to search contains no limitations and a defendant places no limitation on the search, the scope of the allowable search may be fairly broad.'" *Arroyo-Sotelo,* 131 Or App at 297 (quoting *State v. Allen,* 112 Or App 70, 74, 826 P2d 127, *rev den,* 314 Or 176 (1992)). However, an officer's open-ended request for consent to search a car—or, in this case, the deputy's question about items of concern in defendant's car, prompting defendant's offer of a search of the car—does not necessarily give an officer unfettered permission to search containers within that car.

If a request for consent is vague or the law enforce-ment officer does not specify the target of the search, the request for consent extends to objects and areas that "a reasonable person in [the] defendant's position would have understood" to be included based on the circumstances. *Lamoreux,* 271 Or App at 763. It follows that a general request for consent to search a car does not extend to closed containers in the car if no other circumstances reasonably indicate that the officers are searching for something that could be hidden in those containers.

For example, in *Jacobsen,* to which defendant lik-ens his case, we held that a general request for consent to search a car did not extend to a zipped duffel bag in the car, when no circumstances reasonably indicated that the officers intended to search for contraband that could be hid-den in the bag. 142 Or App at 349-50. In that case, officers interacted with a defendant who was illegally parked in a public park after dark, in a pickup truck that did not belong to him, after allegedly having a fight with his girlfriend. *Id.* at 343. The officers noticed that the pickup was filled with personal property, and the police asked for consent to "look around" in the bed of the truck. *Id.* Having found no evidence of criminal activity, the officers asked for consent to "look" inside the cab of the truck, to which the defendant responded "sure." *Id.* One of the officers unzipped a closed duffel bag on the driver's side seat and found a loaded pistol

inside. *Id.* at 343-44. We concluded that an "objectively reasonable person would have understood defendant's consent to authorize a more general sweep of the truck's cab," one that did not extend to the zipped duffel bag, given that the "request to search was very general in nature," the officer's request was "casual" and "basic conversation," and the officer did not indicate that he was searching for specific items that might be found in containers like the duffel bag. *Id.* at 349-50 (internal quotation marks omitted); *see also Harvey,* 194 Or App at 107 (emphasizing that our holding in *Jacobsen* was fact-specific).

In contrast, a general request for consent to search a car will extend to closed containers if, under the circumstances, a reasonable person would have known that the law enforcement officer is looking for something that could be hidden in closed containers. When the officer expressly asks to search for specific contraband that could be hidden, a reasonable person would know that the scope of the consent to a search extends to such hiding places. *See, e.g., Allen,* 112 Or App at 75 (officer did not exceed scope of consent, in part, because he specifically asked if he could search car for drugs or large amounts of cash and the defendant agreed).

When the officer does not specify the objects of the search, the same "reasonable person would have known" standard can be met if other circumstances reasonably indicated to the person giving consent what those objects were. For example, in *Lamoreux,* 271 Or App at 762-63, an officer did not exceed the scope of consent by searching inside a closed bag found in a car, because of the preceding interaction between the officer and the defendant. The defendant knew that the officer was aware that he was on probation, and a reasonable person in the defendant's position would perceive from the conversation with the officer that the officer also knew that he was on probation for drug crimes. *Id.* at 763. In that context, a reasonable person would have understood that the request to search extended to places where drugs could be hidden. *Id.* In addition, the officer had asked to "search" the car, rather than "look" in the car, communicating his intent to conduct a more probing investigation. *Id.* at 762-63.

*State v. Charlesworth/Parks*, 151 Or App 100, 951 P2d 153 (1997), *rev den*, 327 Or 82 (1998), on which the state relies, provides another example. In that case, officers arrived at the house of one of the defendants to execute a search warrant for evidence related to an ongoing drug trafficking investigation, *id.* at 113, after his codefendant had been indicted for laundering proceeds of drug trafficking, *id.* at 103. An officer asked the defendant, who was already in handcuffs, if the police could search his car, and he said, "Yeah, go ahead." *Id.* at 113 (internal quotation marks omitted). An officer then entered the car, retrieved a briefcase, and opened it in front of the defendant. *Id.* at 113-14. The police discovered documents that allowed them to obtain additional search warrants. *Id.* at 103. The trial court found that the defendant had "considerable experience with the criminal justice system"; knew that he had "the right to refuse to give consent"; and had been informed of his *Miranda* rights. *Id.* at 114. We held that, "on [that] record," the scope of consent to search the car extended to items within the car because the officer's request "contained no limitation on the proposed search" and the defendant's response "placed no restriction on it." *Id.* at 115. Viewing *Charlesworth/Parks* consistently with our subsequent cases, given that the police had arrived at the defendant's home to execute a search warrant for evidence related to drug trafficking, the defendant would have reasonably understood that the request for consent to search encompassed places in his car where such evidence might be hidden, such as a briefcase. *See also Harvey*, 194 Or App at 104, 107-08 (officer did not exceed scope of consent when he asked for consent to search the defendant's car, parked in the driveway of the house to which the officers went for an unrelated criminal investigation, after another officer had informed him and the defendant that drug paraphernalia had been found in the house; a reasonable person would have understood that the object of the request "was to search for drugs" and the scope of the search included "any compartments or containers in the car that might hold them").

In this case, the deputy did not specifically identify any items in his communication with defendant. A reasonable person would not have understood the scope of the deputies' interest in the car to extend to the contents of the

zipped fanny pack found under the passenger's seat from the open-ended and vague question Robeson asked defendant, namely, whether there was "anything in the vehicle that we should be concerned about." Defendant responded "no," and said that "if [the deputies] wanted to search the vehicle, [they] could." The only location of the search specified was the car itself.

Nor would a reasonable person infer, based on the surrounding circumstances, that the deputies were going to look for small items, such as the drug paraphernalia they found, that could be hidden in a fanny pack. At the time that Robeson asked defendant about anything of concern being in the car, the deputy had focused solely on obtaining information from defendant to verify his identity, after stopping the car for a seatbelt violation. The record contains no evidence that the deputies at the traffic stop communicated a belief that defendant had drugs in the car. Therefore, the deputy's question regarding anything of concern in the car did not reasonably communicate that he was interested in looking through closed containers in the car for drugs.

And, nothing in defendant's response conveyed to the police that they could search all closed containers in the car. *See Jacobsen*, 142 Or App at 349-50 (inquiring what a reasonable person would have understood the scope of consent to be, based, in part, on the contents of the defendant's consent). Defendant told the deputies that they could search the car, and, in his words, defendant said, "I don't care but [I've] got a whole bunch of stuff in the trunk of the car. * * * I'd like you to put it back when you're done." That statement reasonably communicated that the police could conduct an examination of the vehicle, including removing defendant's personal property from the trunk. But it did not reasonably communicate that the police could meticulously search through defendant's personal property in the car by opening all closed containers, including the zipped fanny pack.

In sum, in this case, which began as a traffic stop for a seat belt violation, the state did not meet its burden as a matter of law. *See* ORS 133.693(4) ("Where the motion to suppress challenges evidence seized as the result of a warrantless search, the burden of proving by a preponderance

of the evidence the validity of the search is on the prosecution."). Neither the deputy's question about there being anything of concern in the car nor the surrounding circumstances would indicate to a reasonable person in defendant's position that consent to a search of the car would lead the deputies to open up and search inside things, such as the fanny pack, located within the car for unspecified items of concern. Therefore, we hold that the police exceeded the scope of defendant's consent by searching the fanny pack found in the car. As a result, we conclude that the trial court erred in denying defendant's motion to suppress the physical evidence found in the fanny pack.

We next turn to the issue of defendant's subsequent statements, which he made after receiving belated *Miranda* warnings and after the deputies showed him the drug paraphernalia that they had found in the fanny pack. The Supreme Court has directed us to do the following on remand:

> "If the Court of Appeals finds that the deputy's search did not exceed the scope of defendant's invitation, then the remaining question is whether the statements that defendant made to the deputy after receiving belated Miranda warnings were admissible. As we understand defendant's argument on that issue, it rests on the proposition that the deputies unlawfully discovered the physical evidence in his car and that, as a result, the belated *Miranda* warnings he received were not effective to render his statements voluntary. If the deputies lawfully discovered the physical evidence in defendant's pack, then the physical evidence and defendant's warned statements presumably would be admissible. Conversely, if the deputy's search exceeded the scope of defendant's consent, then the question will be, as it was in *Vondehn,* whether the belated *Miranda* warnings were effective. *See [State v.] Vondehn,* 348 Or at [462,] 485-86[, 236 P3d 691 (2010)] (holding that belated *Miranda* warnings were effective even though officers unlawfully had discovered marijuana in the defendant's backpack)."

*Delong II,* 357 Or at 385-86. We understand that the Supreme Court is directing us to analyze "whether the belated *Miranda* warnings were effective" to render defendant's later statements admissible. *Id.* at 386. However,

we do not read the decision in *Delong II* as directing us to apply the test for effective late *Miranda* warnings set forth in *Vondehn* and only that test. Instead, because the search of the fanny pack in this case was a violation of Article I, section 9, which protects against unreasonable searches and seizures, we conclude that, although *Vondehn* informs our decision in this case, we must consider the "totality of the circumstances surrounding the police-defendant encounter," *State v. Musser*, 356 Or 148, 154, 335 P3d 814 (2014), to determine whether defendant's post-*Miranda* statements should be suppressed.

We begin by emphasizing that, unlike in this case, *Vondehn* addressed the circumstances under which belated *Miranda* warnings will cure an earlier Article I, section 12, violation so that post-*Miranda* statements are admissible. 348 Or at 467. As the Supreme Court explained in *Vondehn*,

> "[t]he Oregon Constitution requires *Miranda* warnings to ensure that a waiver of the rights conferred by Article I, section 12, is knowing as well as voluntary. * * * When the police then correct course and give the required warnings, the relevant inquiry must be whether the belated warnings are effective and accomplish the purpose for which they are intended."

*Id.* at 480. In determining whether belated *Miranda* warnings were effective,

> "courts should consider all relevant circumstances, including * * * the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the statements given by the suspect, the timing and setting of the first and the second interrogation sessions, the continuity of police personnel, the degree to which the interrogator's questions treated the second round of interrogation as continuous with the first, and whether the police cautioned that the earlier unwarned statement could not be used in any subsequent prosecution."

*Id.* at 482. The overarching question is "whether the *Miranda* warnings, when given, accurately and effectively conveyed the information necessary to a knowing and voluntary waiver of the right against self-incrimination." *Id.* at 485.

The facts at issue in *Vondehn* are, in many respects, similar to those in this case. In *Vondehn*, the defendant was a passenger in a car that the police stopped to investigate a traffic violation and possible driving under the influence of intoxicants. *Id.* at 483. One of the officers asked the defendant for his identification. After discovering an outstanding warrant for the defendant, the police arrested the defendant, handcuffed him, and placed him in the back of the patrol car while they completed their investigation. *Id.* Then the officers requested and obtained consent from the driver to search the car. *Id.* at 484. The officers found a backpack that smelled of marijuana. *Id.* Without warning the defendant of his *Miranda* rights, the police took the backpack to the defendant and asked him if it was his and if it contained marijuana; the defendant answered yes to both questions. *Id.* The officer then requested consent from the defendant to search the backpack, which the defendant gave. The police opened the backpack in the defendant's presence and found the marijuana, *id.*, evidence that the Supreme Court concluded should be suppressed because it derived from the preceding police violation of Article I, section 12, *id.* at 475-76. Thereafter, the police gave the defendant *Miranda* warnings for the first time, he waived his rights, and the defendant answered a series of questions about the marijuana while still in the patrol car. *Id.* at 484.

The defendant moved to suppress his pre-*Miranda* statements, the marijuana, and his post-*Miranda* statements. *Id.* at 464. In our decision in *State v. Vondehn*, 219 Or App 492, 499-507, 184 P3d 567 (2008), *aff'd in part, rev'd in part*, 348 Or 462, 236 P3d 691 (2010), we considered whether courts should apply an exploitation analysis to vindicate the constitutional right not to be compelled to provide testimony or furnish evidence against oneself under Article I, section 12, similar to the one applied to determine whether suppression of evidence following a violation of Article I, section 9, is necessary to vindicate that constitutional right. We held that, when the police exploit an interrogation in violation of Article I, section 12, because of a failure to give *Miranda* warnings, courts should exclude the evidence obtained as a result. *Id.* at 507. Applying that holding specifically to whether the defendant's post-*Miranda* statements should be

suppressed, we concluded that the police exploited both his pre-*Miranda* statements and the marijuana "obtained from the search of the backpack, evidence that was itself the fruit of the previous exploitation of the original illegality." *Id.* at 509.

On review, the Supreme Court in *Vondehn* did not adopt that reasoning or consider whether the police questioning of the defendant after the police had the drugs in hand affected the analysis of the effectiveness of the belated *Miranda* warnings that the defendant received. Rather, the court held that the defendant's post-*Miranda* statements should have been admitted because the belated *Miranda* warnings "accurately and effectively communicated that defendant had, from that time forth, a right to remain silent." *Id.* at 486. In coming to that conclusion, the Supreme Court applied its multi-factor test and emphasized four facts.

First, the court noted, "there was a marked difference in the questioning before and after" the police issued *Miranda* warnings:

> "The unwarned questions were routine in nature and consumed less than a minute of time. The second warned questions were significantly more detailed and probing. This was not a situation * * * in which the police conducted extensive questioning and elicited significant detailed facts in the first interrogation session and then repeated that questioning post-*Miranda*."

*Id.* at 485 (footnote omitted). Second, "there was a [five-minute] break in the questioning," which, "[g]iven that the first set of questions consumed less than a minute, * * * was an objective indication that the situation had changed and was governed by new rules." *Id.* Third, the fact that the interrogating officer "did not caution defendant that his earlier unwarned statements could not be used in any subsequent proceeding" was not dispositive, because "that caution may militate * * * in favor of finding that the officer's belated *Miranda* warnings were effective, but such a caution is not necessary to that result." *Id.* at 486. Finally, "although defendant was under arrest and handcuffed when [the police] questioned him and was thus in inherently

compelling circumstances, he was not subjected to additional coercion." *Id.* Again, the Supreme Court did not consider the effect of the officers' discovery of the marijuana, physical evidence that it concluded must be suppressed, as a factor in the analysis of whether the defendant's post-*Miranda* statements concerning the marijuana, made minutes after the police opened the backpack in the defendant's presence, should also be suppressed.

However, unlike in *Vondehn*, this case involves an intervening warrantless search that violated Article I, section 9. *See State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011) (stating that a search is "*per se* unreasonable," in violation of Article I, section 9, in the absence of a warrant or an exception to the warrant requirement). And, when considering the suppression of evidence resulting from such a search, the Supreme Court has repeatedly and recently held that courts must determine whether the police improperly took advantage of or exploited their violation of Article I, section 9.

In *State v. Unger*, 356 Or 59, 333 P3d 1009 (2014), the Supreme Court modified part of the exploitation analysis that Oregon courts will apply. But the court adhered to the central part of the exploitation test, in the context of a consent search, which "requires the state to prove 'that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct.'" *Id.* at 76 (quoting *State v. Hall*, 339 Or 7, 35, 115 P3d 908 (2005)). The court emphasized that exploitation analysis, generally, must be nuanced, *id.* at 87, and requires "consideration of the totality of the circumstances" surrounding the encounter at issue to determine whether the state has proved that the police did not exploit their prior illegal conduct to obtain the evidence that the defendant urges must be suppressed, *id.* at 86. Among the factors courts should consider are the severity of the constitutional violation, the purpose and flagrancy of the police misconduct, inevitable discovery of the evidence by the police in the absence of illegal conduct, the temporal proximity of the violation to the discovery of the evidence, and intervening and mitigating circumstances, such as *Miranda* warnings. *Id.* at 83-86; *Hall*, 339 Or at 25, 35.

Accordingly, defendant argues for suppression of his post-*Miranda* statements. Citing *State v. Ayles*, 348 Or 622, 638-39, 237 P3d 805 (2010), defendant argues that those statements must be excluded because they directly derived from the unlawful search of the fanny pack, an Article I, section 9, violation. In *Ayles*, the Supreme Court held that, "[g]iven that defendant's illegal seizure led to an illegal search of defendant's person that revealed defendant's possession of a controlled substance and that that discovery, in turn, led to defendant's arrest (which triggered the giving of the *Miranda* warnings), it is impossible to conclude that the *Miranda* warnings alone were adequate to break the causal chain between the illegal police conduct and the subsequent incriminating statements and discovery of evidence." *Id.* Following that reasoning, defendant argues that the police exploited the unlawful search to obtain his incriminating statements, despite *Miranda* warnings. Without the unlawful search, he argues, Poe would not have found the drug paraphernalia and confronted defendant with them, and defendant would not have made incriminating statements about them. The state does not respond to that argument, having rested solely on its contention that the search was within the scope of defendant's consent.

We ultimately agree that defendant's post-*Miranda* statements must be suppressed, but we do so only after reviewing the range of considerations in the *Unger* exploitation test, including the giving of belated *Miranda* warnings in this case. First, the circumstances surrounding the unlawful search weigh in favor of suppression. The police conduct was intrusive; it involved an invasion of defendant's privacy interest in his possessions. And, the police misconduct was purposeful and flagrant. The deputies conducted the unlawful search in order to hunt for unspecified incriminating evidence. At the time that Robeson searched the car, defendant had made no incriminating statements regarding drugs, and Robeson had only a general belief that defendant was not being truthful and that "something [was] going on." The unlawful search of the fanny pack revealed the methamphetamine, which provided the specific basis for Robeson to question defendant about illegal drug possession and directly prompted defendant's incriminating

statements. There is no evidence that, without the illegal search, the deputies would have obtained defendant's incriminating statements about drug use and possession. In short, the entire purpose of the unlawful search was to uncover "something" illegal, which would put defendant in the position of confessing to a crime. *Cf. State v. Clemons*, 267 Or App 695, 702, 341 P3d 810 (2014) (officer's "purposeful and flagrant fishing expedition" weighed toward suppression under Fourth Amendment fruit of the poisonous tree analysis).

Second, no intervening or mitigating circumstances attenuated the taint of the unlawful search. After discovering the methamphetamine, Poe immediately confronted defendant with it, issued *Miranda* warnings, and interrogated defendant about the drugs; therefore, the belated *Miranda* warnings were the only intervening circumstance. Under *Vondehn*, those warnings were accurate and effective to inform defendant of his Article I, section 12, right against self-incrimination. As in *Vondehn*, here, the police interrogated defendant while he was handcuffed and in the patrol car. In each case, the two sets of interrogation were separated by a search of the car, which yielded incriminating physical evidence and led to additional questioning about that evidence. In each case, the first set of questioning— mostly about the defendant's identity—was "routine" and concerned "marked[ly] differen[t]" subject matter than the second set of questioning, which concerned the defendant's relationship to the drugs discovered. *Vondehn*, 348 Or at 485. And, as in *Vondehn*, here, it is not dispositive that the deputy did not inform defendant that his earlier statements were not admissible against him—especially because defendant did not make any incriminating statements before Poe issued *Miranda* warnings.

Yet, even though the belated *Miranda* warnings were accurate and effective, they were insufficient to attenuate the unlawful search that triggered them. *Miranda* warnings do not, *per se*, attenuate police misconduct, and that is particularly the case when police misconduct triggers *Miranda* warnings in the first place. *See Ayles*, 348 Or at 638. The Supreme Court analyzed such a situation in

*Ayles*, where, during a traffic stop, the police patted down the defendant and found a pill bottle in his pocket. The officer asked him, "Is that the meth?" When the defendant confirmed that it was, the police arrested and handcuffed him, advised him of his *Miranda* rights, and placed him in a patrol car. Another passenger told the police that the car contained the defendant's backpack. After retrieving the backpack, the police asked the defendant if the backpack belonged to him and whether it contained additional meth-amphetamine. The defendant replied affirmatively to both questions, and he described in detail what the police would find inside the backpack. *Id.* at 625-26. On those facts, the Supreme Court concluded that the defendant's statements unlawfully derived from the initial unlawful seizure and the unlawful search of the defendant's person and, there-fore, must be suppressed. *Id.* at 638. We adhered to *Ayles* in *State v. Nell*, 237 Or App 331, 341, 240 P3d 726 (2010), con-cluding that *Miranda* warnings did not attenuate the defen-dant's incriminating statements regarding drug possession, made after an unlawful search of her wallet revealed drugs and triggered the *Miranda* warnings.

Here, as in *Nell*, the unlawful search of defendant's property revealed drugs, which triggered *Miranda* warn-ings and caused defendant to make incriminating state-ments about the drugs. And, as in *Ayles*, the initial unlaw-ful seizure led to that unlawful search. The illegal search put defendant in the no-win position of confessing to owning the fanny pack and drugs or incriminating, by process of elimination, the other passenger in the car. Without the ille-gal search, defendant would not have been in that position. Therefore, the police exploited the illegal search to gain an advantage over defendant. *Cf. State v. Olendorff*, 267 Or App 476, 489, 341 P3d 779 (2014) (police "took advantage of the unlawful seizure by putting defendant in the position of hav-ing to choose between disclosing the contents of her purse and risking the prosecution that [the police] said could fol-low if defendant's purse arrived at the jail with drugs inside it").

Thus, we conclude that the state has not met its bur-den to prove that, under the totality of the circumstances,

the police did not exploit the unlawful search to obtain defendant's incriminating statements. Accordingly, the trial court erred in admitting defendant's post-*Miranda* statements.

Reversed and remanded.